KEITH, Circuit Judge.
 

 Appellant-cross appellee First Tennessee Bank National Association (“Bank”) appeals the district court’s grant of summary judgment in favor of appellee-cross appellant Leasing Services Corporation (“LSC”). In its ruling, the court held that LSC was the holder of a security interest, senior to the Bank’s own security interest, in the collateral of Metier Crane and Rigging Co. (“Metier”). The court reasoned that the rejection by the trustee-in-bankruptcy of unexpired portions of certain lease agreements between Metier and a third party did not alter the relative priorities between the secured creditors of Metier. The court also held that the public sale by LSC of equipment that had been leased to Metier was commercially reasonable. Following the grant of summary judgment, LSC filed a motion to alter or amend judgment, seeking an award of attorney fees. The district court denied the motion and LSC cross-appeals on this issue. For the reasons set forth below, we affirm the judgment of the Honorable Thomas G. Hull.
 

 I.
 

 On October 23, 1980, Chatham Machinery, Inc. leased two cranes to Metier. The leases were assigned to LSC. The amounts due under the leases were secured by a security interest in Metier’s inventory, goods, equipment and machinery. LSC perfected its security interest by filing the appropriate UCC-1 financing statements.
 

 After LSC had perfected its security interest, the Bank made several loans to Metier and obtained a security interest in the same collateral. The Bank perfected its security interest by filing the appropriate financing statements.
 

 On December 11, 1984, Metier was placed into involuntary bankruptcy pursuant to Chapter 7 of the Bankruptcy Code. Metier surrendered all of its equipment and machinery, except the two cranes, to the Bank. Pursuant to an order in the bank
 
 *436
 
 ruptcy proceedings, the Bank sold this collateral and realized $443,895.00 from the sale. The trustee-in-bankruptcy later abandoned these assets, thereby leaving the parties to sort out their claims to these funds. Also, the trustee-in-bankruptcy did not assume Metier’s obligation under the lease agreements and was deemed to have rejected these contracts. LSC therefore reclaimed possession of the cranes and sold them, establishing a deficiency balance in the amount of $81,492.88.
 

 On July 8, 1985, LSC made a demand upon the Bank for payment of $81,492.88, plus interest and attorney fees. LSC asserted that Metier was indebted to LSC in that amount under the leases, and that LSC had a security interest in the proceeds realized from the sale of Metier’s collateral that was superior to that of the Bank. The Bank refused to pay LSC.
 

 On October 1, 1985, LSC filed suit against the Bank seeking $81,492.88, plus interest from April 11, 1985, and attorney fees. LSC claimed that the Bank, by refusing to recognize LSC’s prior lien, had converted to its own use funds which LSC was entitled to receive. The Bank answered LSC’s complaint by denying that LSC possessed a superior security interest. The Bank also alleged that Metier’s indebtedness to LSC was overstated because LSC’s conduct in connection with the sale of the cranes was commercially unreasonable.
 

 On March 4, 1986, the district court granted summary judgment in favor of LSC, holding that LSC’s security interest was superior to that of the Bank, and that the sale by LSC of the cranes was conducted in a commercially reasonable manner. Judgment was entered in the amount of $81,492.88, plus interest. On March 14, 1986, LSC moved the court to reconsider its judgment and award attorney fees in the amount of $16,298. This motion was denied.
 

 II.
 

 On appeal, the Bank initially argues that the district court erred in holding that LSC possessed the superior security interest. It contends that the lease agreements between Metier and LSC (the assignee) were executory contracts, or unexpired leases. The Bank further contends that pursuant to 11 U.S.C. § 365(d)(1),
 
 [1]
 
 the rejection of the lease agreements by the trustee operated as a matter of law as a rejection of all covenants contained in the leases, including the grant of the security interest. Thus, the Bank argues that the rejection of the leases constituted a breach of the exec-utory and nonexecutory portions of the contracts, leaving LSC in the position of an unsecured creditor.
 

 LSC argues that while rejection of a lease obligation does have the effect of a breach of the contract, it does not affect the creditor’s secured status. We agree.
 

 Section 365 of the Bankruptcy Code, 11 U.S.C. § 365, provides that a debtor-in-possession or a trustee may assume or reject any executory contract or unexpired lease of the debtor. Rejection denies the right of the contracting creditor to require the bankrupt estate to specifically perform the then executory portions of the contract. Rejection also limits the creditor’s claim to damages for breach of contract.
 

 The statutory purpose of Section 365 of the Bankruptcy Code is to enable the trustee to assume those executory obligations which are beneficial to the estate while rejecting those which are onerous or burdensome to perform.
 

 The legislative purpose underlying Section 70b [the predecessor to § 365 under the Bankruptcy Act of 1938] was to solve the problem of
 
 assumption of liabilities, i.e.,
 
 excusing or requiring future specific performance . by the bankrupt_ [W]hat Section 70b actually proposed to do was to secure this continued mutuality [of obligation and performance] wherever it was felt to be of greater benefit
 
 *437
 
 to the estate to proceed in accordance with the bankrupt debtor’s plans rather than to freeze his commercial relations as of the filing date.
 

 2
 
 Collier on Bankruptcy,
 
 ¶ 365.01[2] (15th ed. 1987) (emphasis in original).
 

 Thus, rejection or assumption of an exec-utory contract determines only the status of the creditor’s claim, i.e., whether it is merely a pre-petition obligation of the debt- or or is entitled to priority as an expense of administration of the estate. The extent to which a claim is secured is wholly unaffected.
 
 [2]
 

 See Jenson v. Continental Financial Corp.,
 
 591 F.2d 477 (8th Cir.1979) (footnotes omitted);
 
 See also
 
 11 U.S.C. § 506.
 

 The Bank strenuously argues that the trustee’s rejection of the contracts extended to non-executory as well as executory portions of the agreement. As a result, it argues that LSC was divested of its security interest. The law, however, does not support the Bank’s position. In
 
 Jenson,
 
 the Eighth Circuit held that a security agreement securing debtor’s obligations under a rejected class action settlement agreement was nonexecutory and therefore valid. The security agreement had been given to secure debtor’s obligations under either the settlement or under any judgment subsequently obtained if the settlement failed. The court found that the settlement agreement entered into by the parties was an executory contract subject to rejection by the trustee. However, the security agreement was found to be non-exec-utory and was not subject to rejection by the trustee.
 
 Jenson,
 
 591 F.2d at 482. The court stated:
 

 The consideration given for the security interest was forbearance on the part of the plaintiffs from pressing for the immediate appointment of a receiver for the defendants. This consideration was performed in full by the plaintiffs and the bankrupts have had the full benefit thereof. As such, the trustees have no power to reject the security agreement as executory under Section 70b.
 

 Id.,
 
 (footnote omitted).
 

 Similarly, in the present case, the security interest granted to LSC to secure Metier’s obligation under the leases was fully vested. The consideration for the grant of the security interest was the lessor agreeing to lease the cranes to Metier and LSC agreeing to take an assignment of the leases. Thus, the security interest was non-executory and therefore not subject to the rejection power of the trustee.
 

 The Bankruptcy Code makes clear that Article 9 of the Uniform Commercial Code (“UCC”) governs consensual liens in personal property and fixtures. “For the rights and remedies of the parties, other creditors and third parties, Article 9 is the sole source of the law.” 4
 
 Collier on Bankruptcy,
 
 § 547.49[1] (15th ed. 1987). Thus, in those states which have adopted the UCC, one looks to applicable state law to determine which party has priority.
 

 Issues as to the extent to which a lien in favor of the creditor secures certain obligations which form a part of an allowed claim may arise in the Section 506(a) [Determination of Secured Status] context, but must be decided by reference to the underlying agreements or judgments and applicable state law.
 

 3
 
 Collier on Bankruptcy,
 
 § 506.04[1] (15th ed. 1987) (footnote omitted).
 

 Applicable state law mandates that the first creditor to perfect a security interest has priority status.
 
 See
 
 Tenn.Code Ann. § 47-9-312(5)(a). In the present case, LSC was the first to perfect its interest. Thus, the district court was correct in stating that an acceptance of the Bank’s argument “would be to advance the Bank’s later-perfected ■ security interest above LSC’s prior lien, negating the priority provisions set forth in Article 9 of the Uniform Commercial Code.”
 
 [3]
 

 
 *438
 
 III.
 

 The Bank next argues that the district court erred in granting summary judgment and holding that the sale of the cranes by LSC was commercially reasonable. The Bank initially contends that summary judgment was issued prematurely, without affording it a fair opportunity to respond. The Bank argues that LSC’s motion and accompanying brief did not mention the issue of commercial reasonableness. It states that it was “lulled into interpreting LSC’s motion as one for partial summary judgment addressed to the priority issue.” The Bank further asserts that if its initial contention is not accepted, LSC’s evidence was insufficient to sustain a grant of summary judgment.
 

 LSC responds that in support of its motion for summary judgment, it submitted the affidavit of Deborah D. Corey, which gave details about the public sale of the property. Thus, it argues that the Bank was aware that the motion for summary judgment involved the sale of the cranes. Also, LSC argues that the evidence was sufficient to support a grant of summary judgment because the affidavit provided specific details of the sale. We agree with the position taken by LSC.
 

 LSC’s cross-motion sought summary judgment:
 

 on the complaint brought by it against the Defendant First Tennessee Bank, National Association, on the ground that there is no genuine issue as to any material fact regarding the complaint, and it is entitled to judgment as a matter of law. Accordingly, plaintiff requests judgment against defendant in the amount of $81,492.88, plus interest at $54.33 per day from April 11, 1985, and attorneys’ fees of $16,298.
 

 In support of its motion, LSC submitted the affidavit of Deborah Corey, the LSC employee responsible for handling the Metier account after the default. The affidavit detáiled how LSC had scheduled, advertised and conducted a public sale of the cranes and what the resulting deficiency was. Thus, along with its motion for summary judgment, LSC offered proof that the sale of the cranes was commercially reasonable and resulted in the claimed deficiency.
 

 The Bank voluntarily chose to submit no affidavits or other evidence in response to the Corey Affidavit. It therefore made no factual allegation to support its claim. Fed.R.Civ.P. 56(e) provides that “when a motion for summary judgment is made ... an adverse party ... must set forth specific facts showing that there is a genuine issue for trial.”
 
 Leasing Service Corp. v. Diamond Timber, Inc.,
 
 559 F.Supp. 972, 978 (S.D.N.Y.1983),
 
 aff'd,
 
 729 F.2d 1442 (2nd Cir.1983). The Bank failed to comply with this Rule.
 

 LSC’s sale of the cranes after Metier’s default is governed by Tenn.Code Ann. § 47-9-504, which provides in pertinent part:
 

 Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable ... [Reasonable notification of the time and place of any public sale ... shall be sent by the secured party to the debtor,....
 

 Thus, § 47-9-504 imposes two requirements on the creditor. First, he must send the debtor reasonable notification of
 
 *439
 
 the impending sale, and second, every aspect of the sale, including the method, manner, time, place and terms must be commercially reasonable.
 
 Leasing Service Corp.,
 
 559 F.2d at 978. Commercial reasonableness requires that the disposition of the collateral be made in keeping with the prevailing trade practices among respectable and responsible business and commercial enterprises engaged in the same or similar business.
 
 Pippin Way, Inc. v. Four Star Music Co.,
 
 2 B.R. 454 (Bankr.M.D.Tenn.1979). A commercially reasonable sale is tested by the procedures employed for sale rather than the proceeds received.
 
 Id.
 

 The Bank argues that the affidavit did not contain evidence sufficient to allow the grant of summary judgment to stand. We find, however, that the evidence was sufficient. A Notice of Sale was sent to and received by the Bank. The actual sale price for the cranes was set forth in the auctioneer’s worksheet. The Bank was free to inspect the cranes and make its own determination of their condition. The sale was conducted, as scheduled, on the premises of Furrow Auction Warehouse in Knoxville, Tennessee. In addition to a representative of LSC, employees of Furrow attended and bid on the cranes. LSC followed all of the procedures necessary to make its sale of the cranes commercially reasonable. The Bank has not raised any material issue of fact with respect to the procedures employed. Thus, summary judgment was appropriate.
 
 [4]
 

 IV.
 

 In its cross-appeal, LSC argues that it is entitled as a matter of law to recoup its attorney fees and costs. LSC argues that the lease agreements provided for the payment of attorney fees in the event of default. Thus, it argues that pursuant to 11 U.S.C. § 506(b),
 
 [5]
 
 the district court should have awarded the fees.
 

 We find this argument to be unpersuasive. The lease agreements contractually provide for attorney fees. However, § 506(b) states that reasonable fees are allowed under the agreement under which such claim arose. This action did not arise under the contractual terms of the agreement. This action is being asserted against the Bank on the theory that the Bank improperly converted Metier’s property to its own use. The theory of the case is grounded in tort, not contract. Thus, the language in the lease agreements (and therefore § 506(b) of the Bankruptcy Code) is not applicable. The issues of whether to award attorney fees and, if so, the reasonable amount of attorney fees to be allowed, are issues committed to the sound discretion of the trial court.
 
 American Commercial Barge Lines Co. v. N.L.R.B.,
 
 758 F.2d 1109 (6th Cir.1985). We hold that the district court did not abuse its discretion in this case.
 

 Accordingly, for the reasons set forth above, we AFFIRM the Honorable Thomas G. Hull’s grant of summary judgment in favor of LSC and subsequent order denying LSC attorney fees.
 

 [1]
 

 . 11 U.S.C. § 365(d)(1) provides:
 

 In a case under Chapter 7 of this title, if the trustee does not assume or reject an executory contract or unexpired lease of ... personal property of the debtor within 60 days after the order for relief, or within such additional time as the court ... fixes, then such contract or lease is deemed rejected.
 

 [2]
 

 . "Similar to the trustee’s power to abandon or accept other property, this option is to be exercised in situations where the estate will be bene-fitted and not where the only effect of its exercise would be to convert a contractor’s claim into a first priority expense of administration.”
 
 Jenson,
 
 591 F.2d at 481.
 

 [3]
 

 . Section 506 of the Bankruptcy Code controls the determination of the extent to which an allowed claim is a secured claim. Specifically,
 
 *438
 
 a claim is secured to the extent of the value of the creditor's interest in the debtor’s property to which the lien has attached. It is unsecured only to the extent that the amount of the claim is larger than the value of the creditor’s interest in the property. 3
 
 Collier on Bankruptcy,
 
 § 506.04[1] (15th ed. 1987). There is no dispute that LSC’s claim is allowed.
 
 See
 
 11 U.S.C. § 502. Also, there is no dispute that the value of the collateral exceeded the amount of LSC’s claim.
 

 The only other challenge to the secured status of LSC’s claim is one of the grounds for avoidance of its lien under 11 U.S.C. §§ 545, 546, 547, 548 and 549. 3
 
 Collier on Bankruptcy
 
 § 506.01 (15th ed. 1987). The Bank has not claimed that LSC’s lien lacks priority pursuant to the above sections.
 

 [4]
 

 . The Bank argues that it was commercially unreasonable for LSC to pay "itself a sales commission of $36,885 and ... other selling expenses of $1,429.08.” We find, however, that the claim has no validity because under the express terms of the leases, in the event of default, the lessor was entitled to deduct from the proceeds of sale a sum equal to 15% of the total rent.
 
 See Leasing Service Corporation v. Justice,
 
 673 F.2d 70 (2nd Cir.1982).
 

 [5]
 

 . 11 U.S.C. § 506(b) states:
 

 (b) To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided under the agreement under which such claim arose.