**In the Matter of JRT, INC., d/b/a TCBY, Debtor.**

**JRT, INC., Plaintiff,**

v.

**TCBY SYSTEMS, INC., Defendant.**

**Bankruptcy No. GG 90–83557. Adv. No. 90–8377.**

United States Bankruptcy Court, W.D. Michigan.

Nov. 6, 1990.

Roland Rhead, Lansing, Mich., for JRT, Inc.

Ronald Rose, Detroit, Mich., for TCBY Systems, Inc.

### MEMORANDUM OPINION

JAMES D. GREGG, Bankruptcy Judge.

The issues addressed by this opinion are twofold. First, should the Debtor–Plaintiff be granted a preliminary injunction which prohibits the Defendant from continuing a pending legal action against the Debtor's officers and directors? Second, should the Debtor be authorized to reject an alleged executory franchise agreement with the Defendant and, if so, is a covenant not to compete in the agreement also rejected?

### PROCEDURAL BACKGROUND

JRT, Inc., (the "Debtor"), filed its petition for relief under chapter 11 of the Bankruptcy Code on August 13, 1990. The Debtor has very few creditors; the creditor

who asserts the largest claim amount appears to be TCBY Systems, Inc., ("TCBY").

On September 20, 1990, the Debtor filed its Motion for Stay of Proceedings Against Timothy Nickodemus and Jamie Nickodemus, Officers, Directors, and Co–Owners of Debtor. On October 5, 1990, TCBY filed its response to the Debtor's motion. On October 9, 1990, at a hearing with respect to the motion, the court raised the issue of whether the relief sought was appropriately requested by a motion or whether an adversary proceeding was required. See, B.R. 7001(7). At the hearing, both the Debtor and TCBY agreed that the court may treat the motion as a complaint and the response as an answer. B.R. 9014. Rather than proceeding to then hold a hearing, the court conducted a pretrial conference and issued its First Pretrial Order. After entry of the pretrial order, the Debtor filed its Motion for Preliminary Injunction and the motion was scheduled to be heard on October 22, 1990, with one-half day reserved for trial.

On October 3, 1990, the Debtor filed its Motion to Reject Franchises with TCBY Systems, Inc. This motion was also scheduled to be heard on October 22, 1990.

At the October 22 hearing, the parties each requested that the court consolidate the motion for preliminary injunction and the motion to reject the franchise agreements into a single hearing. The parties asserted that common issues of fact were involved. The court granted the parties' request and consolidated the motions only for purposes of hearing.

Jurisdiction over these matters exists pursuant to 28 U.S.C. § 1334. This consolidated matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O). This Memorandum Opinion constitutes the court's findings of fact and conclusions of law. B.R. 7052.

### FACTS

Timothy Nickodemus, ("Nickodemus"), is the president and a shareholder of the Debtor. His wife, Jamie Nickodemus, is the vice-president of the Debtor.

The Debtor opened its first store on February 1, 1987. Subsequently, the Debtor expanded to operate six stores at various locations in the Grand Rapids, Michigan area. The Debtor's business is selling frozen yogurt to retail customers. For each location, the Debtor entered into a separate franchise agreement with TCBY. (See Plaintiff's Exhibit 4.) When the Debtor and TCBY entered into each franchise agreement, Timothy and Jamie Nickodemus also entered into a guaranty and assumption agreement. The parties stipulated that each separate franchise agreement relating to each store location is nearly identical in all material terms.

Paragraph 16.B. of each franchise agreement requires the Debtor, as franchisee, to discontinue using any marks or distinctive designs of TCBY after the termination or expiration of the agreement. This clause requires the Debtor to "de-identify" the former store, at its expense, to prevent the possibility of confusion with the former store or other TCBY franchised stores. (Plaintiff's Exhibit 4.)

Paragraph 16.D. of each franchise agreement contains a covenant not to compete. This paragraph states in its entirety:

If: (1) this Agreement expires without renewal and the COMPANY exercises its option to purchase the assets of the STORE pursuant to Paragraph E of this Section 16; or (2) prior to its expiration the Franchise is terminated by the COMPANY in accordance with the provisions of this Agreement or by FRANCHISEE without cause; then FRANCHISEE agrees that for a period of two (2) years, commencing on the effective date of termination, or the date on which FRANCHISEE ceases to conduct the business conducted pursuant to this Agreement, whichever is later, FRANCHISEE will not have any interest as an owner, partner, director, officer, employee, consultant, representative or agent, or in any other capacity, in any frozen yogurt or ice cream restaurant or store or any other restaurant or store serving principally dessert items located or operating within a radius of ten (10) miles of the STORE or a radius of three (3) miles of any other

"TCBY" store in operation on the effective date of expiration or termination (as applicable), except for other "TCBY" stores operated under franchise agreements granted by the COMPANY and the ownership of securities listed on a stock exchange or traded on the over-the-counter market that represent one percent (1%) or less of that class of securities.

Sometime before the Debtor filed its chapter 11 bankruptcy petition, Nickodemus contacted three representatives of TCBY and requested that each franchise agreement be modified. The agreement provided the Debtor could sell only TCBY yogurt, and no other food products, unless TCBY consented. (Plaintiff's Exhibit 4.) Nickodemus wanted to sell soup and sandwiches in addition to the TCBY yogurt. This request was denied by TCBY.

Although the Debtor's stores were formerly profitable, the stores are not now profitable. Sales have decreased by approximately 50%. Nickodemus testified that the reasons for the sales decrease include "inter-store cannibalization", increased competition, and market saturation.

Nickodemus testified that the sales break-even point for each store is $200,000 in annual sales. Utilizing actual sales records for January through September, 1990, and projected sales for October–December, 1990, the Debtor's projected sales by location are as follows: Store # 1—$181,529; Store # 2—$160,070; Store # 3—$181,007; Store # 4—$249,957; Store # 5—$168,915; and Store # 6—$143,127. (Plaintiff's Exhibit 1.) Aggregating the actual and projected sales of all store locations, the Debtor will incur substantial losses during the 1990 calendar year. Projecting the current sales into 1991, without projecting any additional percentage sales decline, the Debtor estimates that it will continue to incur future losses in 1991. (Plaintiff's Exhibit 1.)

The Debtor also projects that it will have a $243,000 negative cash flow for the 1991 calendar year. (Oral testimony of Timothy Nickodemus.) Considering all six store locations, during the period of October, 1990 to December 31, 1991, the Debtor's estimated cash flow position will be a negative $375,000. (Plaintiff's Exhibit 3.) Nickodemus testified that unless the Debtor converts its business operations from exclusively yogurt sales to a soup and sandwich business as well, and if the franchise agreement with TCBY is not rejected, the Debtor will have no alternative except to convert this chapter 11 case to a chapter 7 case.

Even if the Debtor closes its two least desirable store locations, and operates the four remaining stores by selling only yogurt, the Debtor will not be profitable. (Plaintiff's Exhibit 5.) However, if the Debtor sells soup and sandwiches, as well as non-TCBY yogurt, at the four best locations, the Debtor projects that it will have a positive cash flow and be able to make a substantial profit. (Plaintiff's Exhibits 6 and 7.)

The Debtor concedes that even if it converts the four best business locations to soup and sandwich shops, the Debtor will incur substantial changeover or conversion expenses during the period of November, 1990 to February, 1991. (Plaintiff's Exhibit 8.) The conversion expenses, including new equipment, a new music system, new signs, leasehold improvements, and printed material, incurred during this changeover period will total $29,000. (Plaintiff's Exhibit 8.) Monthly ending cash balances during the changeover period will be as follows: November, 1990—negative $15,461; December, 1990—negative $28,337; January, 1991—negative $24,831; February, 1991—negative $7,479. Therefore, the Debtor's projected cash losses during the period of November 1990 through February 1991 will be approximately $76,000. (Plaintiff's Exhibit 8.)

During his testimony, Nickodemus failed to explain how these negative cash balances can be funded during the Debtor's chapter 11 business operations. No cogent testimony was provided as to how the Debtor intended to cover administrative expenses during the changeover period other than vague references to "bank lending" or

injection of "additional capital" from unknown sources.

Nickodemus testified that he and his wife are solely responsible for the Debtor's day-to-day business operations, including accounts payable, accounting, maintenance, marketing, training of employees, implementation of business plans, hiring of substitute employees, and general store cleanliness. Nickodemus testified that the Debtor's business requires full-time involvement by both he and his wife.

Nickodemus testified that additional funds will be required to be provided to the Debtor. His wife and he are willing to pledge the remaining equity in their residence to obtain additional financing from Old Kent Bank, the Debtor's current lender, or some other lender. However, Nickodemus admits the only equity which remains in their residence is approximately $5,000. Nickodemus and his wife have *no other assets* except for their stock interest in the Debtor.

Nickodemus testified that he believes that the Debtor can formulate a feasible chapter 11 plan. If the conversion of the store locations to the soup and sandwich shops is successful, Nickodemus believes the Debtor can pay a 100% dividend to unsecured creditors. The court finds this testimony to be overly optimistic at best; based upon the Plaintiff's exhibits, it clearly appears that the Debtor shall not be able to fund the chapter 11 operations during the period of November, 1990 to February, 1991, without incurring substantial unpaid chapter 11 administrative expenses.

During cross-examination, Nickodemus testified that the Debtor is willing to "de-identify" all six stores so the public would not believe the stores to be TCBY franchises. Nickodemus further stated that after the Debtor is reorganized, its principal income will still be received from sale of yogurt. (See also Plaintiff's Exhibit 7.) On cross examination, Nickodemus was again unable to state with any specificity where on-going chapter 11 financing would be found. He again reiterated that a bank would finance the Debtor's operations or that venture capital might be obtained; in

this court's opinion, Nickodemus' testimony remained extremely vague and without evidentiary weight.

Also during cross-examination, Nickodemus testified that $32,500 was paid by the Debtor to his wife and him within one year of the filing of the chapter 11 case. The court notes that Nickodemus and his wife may become obligated to return this transfer to the estate if, and when, the Debtor (as debtor-in-possession), the creditors' committee (if any is later appointed), a trustee, or a creditor seeks to avoid this questionable transfer on behalf of the estate. If this transfer is avoidable, Nickodemus' ability to contribute *any* money to the Debtor will be absolutely illusory.

The only other witness at the hearing was Ruben Ysasi, a representative of Sysco Frost–Pack Food Services, Inc. Ysasi is the director of "deli sales" and is not involved in making any credit decisions. Ysasi has met with Nickodemus and "Chef Joel" (another representative of Sysco) regarding the preparation of unique sandwiches, and to determine what type of non-TCBY yogurt might be supplied to the Debtor. Although Ysasi believes the Debtor will have an excellent possibility of marketing soup, sandwiches and yogurt, Ysasi was unable to support the Debtor's assertions, in any convincing manner, that the Debtor would be able to fund the $76,000 in aggregate chapter 11 administrative losses during the months of November, 1990 to February, 1991.

## LAW AND DISCUSSION

The parties agree that TCBY has instituted legal action against Timothy and Jamie Nickodemus in the United States District Court for the Western District of Arkansas based upon alleged co-obligor or guaranty indebtedness. The Debtor seeks a preliminary injunction which will prohibit TCBY from continuing the Arkansas litigation.

In determining whether to grant or deny a motion for preliminary injunction, four factors must be considered: "(1) the likelihood of Plaintiff's success on the merits; (2) whether the injunction will save the

Plaintiff from irreparable injury; (3) whether the injunction would harm others; and (4) whether the public interest would be served by the injunction." *In re DeLorean Motor Co. (Unsecured Creditors' Comm. v. DeLorean)*, 755 F.2d 1223, 1228 (6th Cir.1985). The four factors which are applicable to the grant or denial of preliminary injunctions must be balanced; they are not prerequisites that must be met. *In re DeLorean Motor Co.*, 755 F.2d at 1229.

In this District, it has been held that the broad powers conferred upon bankruptcy courts under 11 U.S.C. § 105 may authorize a bankruptcy court to enter an injunction which prohibits a creditor from seeking to collect or enforce obligations against a partnership debtor's individual partners. *In the Matter of Old Orchard Inv. Co. (Old Orchard Inv. Co. v. A.D.I. Distributors, Inc.)*, 31 B.R. 599 (W.D.Mich.1983). In *Old Orchard*, Judge Hillman states that "suits to collect from partners should be treated differently by the bankruptcy courts". *Old Orchard*, 31 B.R. at 601. In considering whether a bankruptcy court may enter an injunction against a partnership creditor, it is stated: "If the claim brought against the individual partners is one that was or could be filed against the debtor partnership, allowing the creditor to collect from the partner without the permission of the bankruptcy court effectively allows the creditor an end-run around the automatic stay." *Old Orchard*, 31 B.R. at 602–03. It is further stated that "[c]laims that could not have been filed against the partnership may not be enjoined, and may be collected through customary proceedings." *Old Orchard*, 31 B.R. at 603.

TCBY argues that the *Old Orchard* holding should be strictly construed and limited to only those instances when a partnership creditor seeks to collect a partnership debt from the partners of a debtor. This Court rejects that argument. In *Old Orchard*, it is recognized that "bankruptcy courts have enjoined collection actions against the president of a corporate bankrupt, where that officer was also a guarantor of the corporation's indebtedness." *Old Orchard*, 31 B.R. at 601 [citing *In re Otero Mills, Inc. (Otero Mills, Inc. v. Security Bank &*

*Trust)*, 25 B.R. 1018 (D.N.M.1982)]. In prior bench decisions, when appropriate circumstances are demonstrated, this court has granted very limited injunctions which prohibit a creditor from continuing an action against an officer of a debtor corporation. See, e.g., *In the Matter of Triangle Trades, Inc. (Triangle Trades, Inc. v. Pacific States Leasing, Inc.)*, No. GK 87–02736 (Adv.Proc. No. 87–0644) (Bankr.W.D. Mich. Jan. 7, 1988).

In *Otero Mills*, the court held that a bankruptcy court has jurisdiction to enjoin parties from proceeding in another court against non-debtor persons. To determine whether a preliminary injunction is warranted, *Otero Mills* set forth three factors that the Debtor must demonstrate for the court to enjoin a creditor's action against a co-debtor or guarantor. Those factors are: "(1) irreparable harm to the bankruptcy estate if the injunction does not issue; (2) strong likelihood of success on the merits; and (3) no harm or minimal harm to the other party or parties." *Otero Mills*, 25 B.R. at 1021. With respect to one of the factors, the court recognized that the debtor must show that by the creditor proceeding against the guarantor's property, the debtor's ability to file its reorganization plan would be impaired. *Otero Mills*, 25 B.R. at 1021. In *Otero Mills*, because it appeared the creditor sought to be enjoined was a fully secured creditor, and could recover its allowed secured claim against property of the debtor's estate, the creditor was adequately protected. After considering the relevant factors, the *Otero Mills* court affirmed the bankruptcy court's grant of a preliminary injunction which prohibited the secured creditor from suing the guarantors.

After carefully reviewing the decisions rendered in *Old Orchard* and *Otero Mills*, this court concludes that it may, only in appropriate circumstances, enjoin a creditor from seeking to collect a debt against non-debtor insiders of a debtor corporation. However, the granting of a preliminary injunction is not automatic; sufficient compelling proofs must exist on the record to

warrant the granting of such a preliminary injunction.

■ In this case, Nickodemus has testified that he and his wife spend 100% of their time in operating the Debtor's business. It is further asserted that, if the Arkansas litigation continues, the Debtor will be unable to formulate and file a feasible plan of reorganization. As noted above, Nickodemus asserts that he and his wife will utilize the remaining equity in their residence to obtain financing or to partially fund the Debtor's future chapter 11 plan.

Even accepting Nickodemus' uncontroverted testimony as true and correct for purposes of this hearing, the court concludes that the grant of a preliminary injunction will not assist the Debtor's efforts to formulate, file and confirm a feasible effective plan of reorganization. Nickodemus and his wife only have $5,000 in unencumbered equity with regard to their personal residence. The equity in their residence is Nickodemus' *only* unencumbered asset that could be utilized to fund chapter 11 operations and a chapter 11 plan. The Debtor's own evidence shows that it will incur approximately $76,000 in losses during business operations from November, 1990 to February, 1991. Other than vague assertions that additional capital may be injected, the Debtor has been unable to adequately explain how these losses will be funded during the course of the chapter 11 case.

With respect to the "likelihood of Plaintiff's success on the merits" factor, the Debtor must demonstrate that there exists some *substantial likelihood* of a successful chapter 11 reorganization. The Debtor has failed to meet its burden by sufficient evidence to show that reorganization will be likely if the preliminary injunction is granted. Further, based upon the evidence before the court, the Debtor has also failed to show that the requested preliminary injunction will save the Plaintiff from any irreparable injury. Also, under the facts in this case, the grant of a preliminary injunction would likely harm TCBY—a creditor that is entitled to a prompt determination of its rights and possible remedies against the non-debtors, Timothy and Jamie Nickodemus, in accordance with their asserted co-obligor or guaranty obligations. Finally, when considering the purposes of the bankruptcy statute, it appears that the requested preliminary injunction will not serve to "protect the integrity of the automatic stay … [or] to uphold the Bankruptcy Code policy of preventing a destructive race-for-assets among creditors." *Old Orchard*, 31 B.R. at 602.

For these reasons, the court holds that the Debtor's Motion for Preliminary Injunction must be denied.

## MOTION FOR REJECTION OF FRANCHISE AGREEMENTS

A trustee may seek to reject an executory contract of a debtor. 11 U.S.C. § 365(a). In a chapter 11 case, the debtor-in-possession may exercise the powers of a trustee. 11 U.S.C. § 1107(a).

■ The Bankruptcy Code does not explicitly define the term "executory contract". However, in the Sixth Circuit, an executory contract is an agreement "on which performance remains due to some extent on both sides." *In re Terrell (Terrell v. Albaugh)*, 892 F.2d 469, 471 (6th Cir.1989). This Court has reviewed the TCBY Franchise Agreement, dated March 25, 1988, which has been executed by TCBY and the Debtor. (Plaintiff's Exhibit 4.) Based upon the entire agreement, the court finds the franchise agreement clearly contemplates continuing performance "on both sides". The court therefore concludes that the six franchise agreements are each executory contracts which may be rejected upon a proper showing.[1]

■ Under 11 U.S.C. § 365(a), a debtor-in-possession may reject an executory contract if it is burdensome to the estate. *N.L.R.B. v. Bildisco and Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984); *Leasing Serv. Corp. v. First Tenn. Bank*

---

1. As agreed by the parties, the franchise agreement, admitted as Plaintiff's Exhibit 4, is nearly identical to the other five franchise agreements between the parties.

*Nat'l Assoc.*, 826 F.2d 434, 436 (6th Cir. 1987); *In the Matter of U.S. Truck Co., Inc.*, 24 B.R. 853, 855 (Bankr.E.D.Mich. 1982). In determining whether a contract is burdensome, courts have utilized a business judgment test. *Group of Institutional Investors v. Chicago, M., St.P. & P.R. Co.*, 318 U.S. 523, 63 S.Ct. 727, 87 L.Ed. 959 (1943); *In re Chi–Feng Huang (Robertson v. Pierce)*, 23 B.R. 798 (9th Cir. BAP 1982); *In re Cutters, Inc.*, 104 B.R. 886 (Bankr.M. D.Tenn.1989); *In the Matter of McLouth Steel Corp. (Edwin C. Levy Co., Inc. v. McLouth Steel Corp.)*, 20 B.R. 688 (Bankr. E.D.Mich.1982).

■ Based upon the evidence in this contested matter, the Court concludes that rejection of all executory franchise agreements by and between TCBY and the Debtor is warranted. Unless the franchise agreements are each rejected, the Debtor will suffer losses totaling approximately $396,790.00 during the fifteen-month period of October 1, 1990 to December 31, 1991. (Plaintiff's Exhibit 3.)

TCBY argues that, even if the executory franchise agreements are rejected, the Debtor will continue to be bound by the covenants not to compete which are set forth in the various agreements. (Plaintiff's Exhibit 4, Paragraph 16.D., page 35.) TCBY asserts it can therefore enforce the covenants not to compete in the future.

As a preliminary matter, the parties have summarily addressed the issue of what law applies. During final argument, the parties made reference to cases decided under Michigan law. The court noted that the franchise agreement mandated that the governing law would be Arkansas law. (Plaintiff's Exhibit 4, Paragraph 17.F., pages 40–41.) Alternatively, the court recognized that federal law, rather than any state law, might apply to the issues presented.

■ Congress has the exclusive right to promulgate laws concerning bankruptcy. U.S. Const. Art. I, § 8, cl. 4. Congress has mandated that a trustee, or a chapter 11 debtor-in-possession, may reject executory contracts. The Bankruptcy Code takes precedence over any state law regarding the effect of rejection of an executory contract. U.S. Const. Art. VI, cl. 2; cf. *Perez v. Campbell*, 402 U.S. 637, 652–56, 91 S.Ct. 1704, 1712–15, 29 L.Ed.2d 233 (1971) (provision of state motor vehicle act held invalid under supremacy clause as in conflict with discharge under prior Bankruptcy Act); *In re Calhoun (Long v. Calhoun)*, 715 F.2d 1103, 1107–09 (6th Cir.1983) (determination of dischargeability of particular debts to be determined by federal bankruptcy law). Therefore, this court will not examine state law to determine the effect of the rejection of the TCBY franchise agreement; rather, the court will consider applicable federal bankruptcy law.

TCBY argues that although the Debtor has the authority to reject a burdensome executory contract, the Debtor is precluded from rejecting the non-executory portions of the franchise agreements. To support this position, TCBY relies upon *Leasing Serv. Corp. v. First Tenn. Bank Nat'l Assoc.*, 826 F.2d 434 (6th Cir.1987). In *Leasing Serv. Corp.*, the debtor rejected an executory equipment leasing agreement. It was then asserted that the rejection also extended to certain non-executory portions of the agreement. Specifically, it was argued that rejection of the executory equipment leasing agreement also rejected the creditor's secured status under a security agreement clause contained in the lease agreement.

In considering the possible effect of the *Leasing Serv. Corp.*, it is very important to consider those facts faced by the Sixth Circuit. In October, 1980, Chatham Machinery leased two cranes to Metler, a subsequent bankruptcy debtor, and assigned those leases to Leasing Service Corporation ("LSC"). The amounts due under the leases were secured by Metler's grant of a security interest in its inventory, goods, equipment and machinery. LSC properly perfected its security interest. After perfection of LSC's security interest, First Tennessee Bank ("Bank") made several loans to Metler and also obtained a security interest in the same collateral. The Bank also perfected its security interest.

After the lease transaction and perfected security interests were in place, an involuntary petition was filed against Metler; an order for relief was entered under chapter 7 of the Bankruptcy Code. All of Metler's equipment and machinery, except for the two leased cranes, were surrendered to the Bank. The Bank sold the equipment and machinery and realized in excess of $443,000 in proceeds. The trustee in the chapter 7 case later abandoned the assets thereby leaving the parties to "sort out their claims". Because the chapter 7 trustee did not assume Metler's obligation under the lease agreements, the trustee was deemed to have rejected the lease agreements.

After reclaiming possession of the cranes, LSC sold them and established a deficiency balance in the amount of approximately $81,000. LSC demanded that the Bank pay the deficiency balance out of the proceeds from the sale of the equipment and machinery collateral. LSC argued that it had a prior perfected security interest in the sale proceeds which was superior to the Bank.

The Bank refused to pay LSC and asserted that the chapter 7 trustee's rejection of the executory equipment leases constituted a breach of both the executory and non-executory portions of the leases, thereby leaving LSC in the position of an unsecured creditor. Not surprisingly, the Sixth Circuit rejected the Bank's argument and stated as follows:

> [I]n the present case, the security interest granted to LSC to secure Metler's obligation under the leases was fully vested. The consideration for the grant of the security interest was the lessor agreeing to lease the cranes to Metler and LSC agreeing to take an assignment of the leases. Thus, the security interest was non-executory and therefore not subject to the rejection power of the trustee.

*Leasing Serv. Corp.*, 826 F.2d at 437.

In the contested matter which is now before this court, the facts and circumstances are entirely different from those which existed in *Leasing Serv. Corp.* The issue presented in the *Leasing Serv. Corp.* was simply whether a fully vested and perfected security interest in collateral, held by the assignee of a lessor, constituted an executory contract which could be rejected by a trustee thereby extinguishing the assignee's property rights to its detriment and in favor of a subordinate secured creditor.

In the instant case, the executory franchise agreement does not grant a specific enforceable *property right* in any designated property. While this court agrees with the analysis and holding of *Leasing Serv. Corp.*, the facts in that case are totally inapposite to the facts and circumstances in this contested matter. Therefore, *Leasing Serv. Corp.* is not dispositive.

Normally, absent the existence of special circumstances which grant a valid enforceable security interest in property, this court believes the proper view is that an executory contract must be rejected in its entirety or not at all. *In re Register (Silk Plants, Etc. Franchise Systems, Inc. v. Register)*, 95 B.R. 73, 75 (Bankr.N.D.Tenn. 1989); (rejection of franchise agreement terminated inseverable covenant not to compete); *In re Rovine Corp. (Burger King Corp. v. Rovine Corp.)*, 6 B.R. 661, 666 (Bankr.W.D.Tenn.1980) (covenant not to compete contained in franchise agreement was unperformed in material part by both franchisor and franchisee; therefore entire agreement was executory and could be rejected under 11 U.S.C. § 365).

After reviewing the applicable franchise agreement, the court finds that the Debtor and TCBY each have continuing mutual obligations. (Plaintiff's Exhibit 4.) TCBY owes the Debtor operating assistance, food and beverage products, advertising and promotional program duties, bookkeeping services, assistance in the preparation and selection of foods, and market research and testing. The Debtor owes TCBY a duty to operate its business in accord with specific instructions to utilize trademarks and notify TCBY of any suspected trademark infringements, to keep certain materials and information confidential, to sell only products approved by TCBY, and to pay certain royalties, advertising and service fees. In

addition, the Debtor has a duty to adhere to the covenant not to compete clause. (Plaintiff's Exhibit 4.)

This court recognizes that there is authority for the proposition that if a document purports to contain a single contract, but in reality contains independent severable agreements, then the debtor may assume or reject a severable executory agreement; however, if a severable agreement is *completed,* it may not be assumed or rejected. *In re Gardinier, Inc.,* 50 B.R. 491, 493–94 (Bankr.M.D.Fla.1985) (severable brokerage agreements not assumable because obligations were completed and agreements were no longer executory); *In re Cutters, Inc.,* 104 B.R. 886 (Bankr.M.D. Tenn.1989) (covenant not to compete which was part of completed agreement was not subject to acceptance or rejection). After reviewing the executory franchise agreement as a whole, this court finds that the parties intended the covenant not to compete to be an obligation which should be considered together with the other terms and provisions. The covenant not to compete is an integral, non-divisible part of the executory franchise agreement; therefore, the court holds that the entire franchise agreement, including the covenant not to compete clause, may be rejected.[2]

This court has also thoughtfully considered a case that appears to be decided to the contrary. *In re Noco, Inc.,* 76 B.R. 839 (Bankr.N.D.Fla.1987). The court believes the specific facts addressed by *Noco* are entirely inapposite to the facts in this case. There exist no indications of bad faith in this case. The reasoning of *Noco* is therefore inapplicable to the contested matter currently before this court.

■ TCBY and the Debtor each desire this court to determine whether the covenant not to compete clause may be enforced after rejection of the executory franchise agreement. TCBY argues the clause may be subsequently enforced by injunctive relief; the Debtor argues no in-

junctive relief may be subsequently sought or obtained by TCBY. TCBY further argues that Nickodemus and his wife are obligated, by the asserted co-obligor or guaranty agreements, to independently perform and abide by the franchise agreements, including the covenant not to compete clauses.

This court declines to now determine such issues. At this time, a judicial determination would constitute a hypothetical advisory opinion. No facts have been asserted or alleged that TCBY has, or will have, any other franchises in the vicinity of the Debtor's reorganized business locations. Further, no allegations exist, by the filing of proper pleadings, that TCBY has a remaining enforceable covenant not to compete vis-a-vis the Debtor under applicable federal bankruptcy law. See, e.g., 11 U.S.C. §§ 365(a), 502(g), 502(c), and 101(4). Further, at this juncture, the court declines to decide whether it may exercise jurisdiction to determine what obligations may exist, or remain, by and between two non-debtor parties, i.e., TCBY and Nickodemus.

### CONCLUSION

For the reasons set forth above, the Plaintiff–Debtor's motion for preliminary injunction is DENIED. An appropriate order shall be entered accordingly. Also, for the reasons set forth above, the Debtor's motion to reject the franchise agreements with TCBY is GRANTED. A separate order shall be accordingly entered.

---

2. On November 2, 1990, Honorable Jo Ann C. Stevenson of this court issued a bench opinion in *In the Matter of Pratincole Co., Inc.,* Docket No. 90–83567 (Bankr.W.D.Mich.) which involved the requested rejection of a TCBY franchise agreement. The legal issues addressed by Judge Stevenson were substantially the same, if not identical. This judge notes that this opinion and Judge Stevenson's opinion are entirely consonant.