In re UNIVERSITY MEDICAL
CENTER, Debtor.

UNIVERSITY MEDICAL
CENTER, et al.

v.

Louis W. SULLIVAN, Secretary of the United States Department of Health and Human Services, et al.

Louis W. Sullivan, Appellant
No. 91–1407,

Trustee in Bankruptcy on behalf of University Medical Center and the Unsecured Creditors Committee, Appellants
No. 91–1438.

Nos. 91–1407, 91–1438.

United States Court of Appeals,
Third Circuit.

Argued Feb. 3, 1992.

Decided Aug. 24, 1992.

Rehearing and Rehearing In Banc
Denied Oct. 21, 1992.

Stuart M. Gerson, Asst. Atty. Gen., Michael M. Baylson, U.S. Atty., William Kanter, Mark B. Stern, and Jeffrey Clair (argued), U.S. Dept. of Justice, Civ. Div., Appellate Staff, Washington, D.C., for appellant/cross-appellee.

Mark H. Gallant (argued), James M. Matour, Todd L. Silverberg, and Howard A. Kirkwood, Jr., Wolf, Block, Schorr & Solis–Cohen, Philadelphia, Pa., for appellees/cross-appellants.

Before: BECKER, ROTH, Circuit Judges, and McCUNE, District Judge.[1]

## OPINION OF THE COURT

ROTH, Circuit Judge:

These consolidated cross-appeals by plaintiffs, University Medical Center ("UMC") and the Official Creditors' Committee, and defendant Louis W. Sullivan, Secretary of Health and Human Services, require us to delineate the appropriate relationship between a Medicare provider and the Department of Health and Human Services ("HHS" or "the Department") from the time of the provider's bankruptcy petition filing until its cessation of business—a relationship shaped by the intersection of the Medicare Act and the Bankruptcy Code. Specifically, UMC raises the question of

whether HHS, seeking to recover pre-petition Medicare provider reimbursement overpayments, may withhold payments for Medicare services rendered post-petition without controverting the Bankruptcy Code's automatic stay. The Secretary appeals the order of the district court, affirming the bankruptcy court's finding that HHS violated the automatic stay by withholding such payments. UMC has filed a cross-appeal based on the district court's reversal of the bankruptcy court's award of attorneys' fees and costs to UMC. The district court found that the Department's violation of the automatic stay was not "willful," as is required for such an award under Bankruptcy Code section 362(h).

We agree with the district court that the Secretary's withholding of UMC's Medicare reimbursement, due for services rendered post-petition, in an attempt to recover pre-petition Medicare overpayments, violated the Bankruptcy Code's automatic stay. We further find that this violation was not willful as required for a section 362(h) award of attorneys' fees and costs. We will, therefore, affirm.

## I. STATUTORY AND REGULATORY BACKGROUND

UMC was a participant in the Medicare program, 42 U.S.C. §§ 1395–1395ccc (1988 & Supp. I 1989), which provides health insurance for the elderly and disabled.[2] As a general care hospital, UMC serviced Medicare beneficiaries pursuant to a "provider agreement" filed with HHS. This agreement, executed in 1966 between the Broad Street Hospital and the Secretary of Health, Education and Welfare, the predecessors in interest to UMC and HHS respectively, is similar to provider agreements entered into by hospitals and health care facilities across the country. Through executing the provider agreement, Broad Street Hospital became eligible to receive

---

1. Honorable Barron P. McCune, United States District Court Judge for the Western District of Pennsylvania, sitting by designation.

2. Specifically, UMC served as a health care provider under Part A of the Medicare Act, 42

U.S.C. §§ 1395c–1395i–4, which supplies insurance for eligible beneficiaries providing "basic protection against the costs of hospital, related post-hospital, home health services, and hospice care." 42 U.S.C. § 1395c.

reimbursement payments, in accordance with the terms of the Medicare statute, for services rendered to Medicare beneficiaries. In exchange, the hospital agreed to charge these beneficiaries only as allowed by statute and to comply with certain civil rights laws in providing these services.[3]

Medicare reimbursement of inpatient hospital services is governed by the Prospective Payment System ("PPS"). Under PPS, each discharged patient is classified into a Diagnosis Related Group ("DRG"). Providers are paid most reimbursable expenses pursuant to predetermined, national and regional rates that are fixed for each DRG. *See* 42 U.S.C. § 1395ww(d). HHS makes these reimbursements through fiscal intermediaries, such as the Blue Cross Association. To insure that providers are paid promptly, the Medicare statute requires that payments be made at least monthly and otherwise at the discretion of HHS. 42 U.S.C. § 1395g(a). Under the usual reimbursement procedure, periodic interim payments, which are estimates of actual expenditures, are made by the intermediary upon application of a provider at the discharge of each Medicare patient. Providers are also entitled to receive additional estimated payments based on their actual costs for capital expenses, outpatient services, and certain other costs. 42 C.F.R. § 412.113 (1991). Actual expenditures of each provider are audited by the intermediary annually to determine whether the provider has been over or underpaid for that cost-year. HHS then adjusts the provider's subsequent Medicare reimbursement payments to account for prior over or underpayments. 42 U.S.C. § 1395g(a). Such adjustments are mandated by Medicare's PPS.

## II. FACTS AND PROCEDURAL HISTORY

On January 1, 1988, UMC filed a voluntary petition under Chapter 11 of the Bankruptcy Code. 11 U.S.C. §§ 101–1330 (1988 & Supp. II 1990). After this filing UMC continued to serve Medicare patients as a debtor-in-possession. One week later, on January 8, 1988, Blue Cross of Greater Philadelphia ("Blue Cross"), UMC's fiscal intermediary, informed UMC by letter that the hospital had been overpaid $276,042 for Medicare services provided in 1985. This letter stated that Blue Cross would begin 100% withholding of interim reimbursement payments unless UMC made repayment or agreed to a long-term repayment schedule. UMC did not respond. On February 8, 1988, Blue Cross sent a second letter, again stating that 100% withholding of interim payments would begin unless other arrangements for return of the overpayment were made. Blue Cross subsequently withheld a $58,000 payment on February 18.

Prompted by this action, UMC officials met with a Blue Cross representative and orally agreed to provide Blue Cross with documentation detailing UMC's need for an extended repayment schedule. In the interim, UMC agreed to repay the 1985 overpayment at a rate of $15,000 per month over a period of 18 months. The UMC officials apparently consented to this arrangement in order to maintain the hospital's flow of Medicare reimbursement, which it required to meet its payroll obligations. On March 4, 1988, UMC remitted $15,000 to Blue Cross, after which Blue Cross released the $58,000 it had withheld. However, UMC neither sought court approval of this arrangement nor advised any other interested party, including the Creditors' Committee, of this repayment plan. UMC failed to supply Blue Cross with the documentation needed to formalize the repayment agreement. On March 28, 1988, Blue Cross announced that it would resume

---

**3.** *See* 42 U.S.C. § 1395cc. This section sets forth the terms to which a provider agrees in order to receive payments for services rendered to Medicare beneficiaries under Part A of the Medicare Act. Inter alia, a provider must agree to comply with the requirements of section 1395cc concerning the manner of charging Medicare beneficiaries; the return of monies incorrectly collected from Medicare beneficiaries; the release of patient data to the Secretary; and peer review procedures to ensure quality control. This section also details the procedures for terminating or modifying provider agreements. *See, e.g., Monongahela Valley Hosp., Inc. v. Sullivan,* 945 F.2d 576, 580 n. 8 (3d Cir.1991).

100% withholding. Three days later, UMC closed its doors and ceased doing business.

HHS, through Blue Cross, withheld from UMC a total of over $312,000 in reimbursement for Medicare services provided by UMC after it filed its petition in bankruptcy.[4] Meanwhile, Blue Cross determined that, in addition to the 1985 overpayment, UMC had been overpaid by $470,894 in 1986 and by $65,447 in 1987.

On June 17, 1988, UMC brought an adversary proceeding against HHS in the Bankruptcy Court for the Eastern District of Pennsylvania, alleging that the Department's actions, in demanding payment for pre-petition Medicare overpayments and in withholding post-petition reimbursement to recover the amounts overpaid, violated the automatic stay provision of the Bankruptcy Code, 11 U.S.C. § 362. UMC requested turnover of these funds, pursuant to Bankruptcy Code sections 542 and 543, and an award of attorneys' fees and costs under Code section 362(h). HHS answered by claiming the affirmative defense of contractual recoupment. On July 8, 1988, HHS filed a separate motion for relief from the automatic stay.

The bankruptcy court held that HHS had violated the Bankruptcy Code's automatic stay provision. This conclusion was based upon the court's finding that UMC had not assumed its provider agreement and that as a consequence the Department's demand that UMC repay the pre-petition over-payments as a condition of receiving future Medicare reimbursement constituted the type of governmental discrimination against debtors prohibited by the anti-discrimination provision of the Bankruptcy code, 11 U.S.C. § 525(a).[5] *In re University Medical Center*, 93 B.R. 412, 416–417 (Bankr.E.D.Pa.1988). In reaching this decision, the bankruptcy judge relied heavily on his opinion in an unrelated case, *In re St. Mary Hospital*, 89 B.R. 503 (Bankr. E.D.Pa.1988), which was decided while the present action was pending.[6] Because the bankruptcy court held the withholding to be impermissible under section 525(a), it also refused to grant relief from the stay under 11 U.S.C. § 362(d)[7] and ordered HHS both to return the $15,000 payment made by UMC in accord with the tentative repayment agreement and to pay UMC the amount due for post-petition Medicare services. *University Medical Center*, 93 B.R. at 417–18. In addition, the court awarded UMC prejudgment interest, attorneys' fees, and costs, on the ground that the Department's decision to press this litigation after that court's decision in *St. Mary Hospital* amounted to a willful violation of the automatic stay. *Id.* at 418–19.

HHS appealed this decision to the United States District Court for the Eastern District of Pennsylvania. In a published opinion, the district court affirmed the holding that HHS had violated the automatic stay but disavowed the reasoning of the bank-

---

**4.** This $312,000 includes the March 4, 1988, payment of $15,000 by UMC to Blue Cross.

**5.** Section 525(a) states, in pertinent part:

[A] *governmental unit may not* deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, *discriminate with respect to such a grant against,* ... a person that is or has been a debtor under this title or a bankrupt or a debtor under the Bankruptcy Act ... solely because such bankrupt or debtor is or has been a debtor under this title or a bankrupt or debtor under the Bankruptcy Act.

11 U.S.C. § 525(a) (emphasis added).

**6.** *St. Mary Hospital* also involved a Medicare provider which had filed in bankruptcy under Chapter 11 and had been previously overpaid by HHS. In that case, the same bankruptcy judge found section 525(a) to preclude the Secretary's withholding of interim payments and granted an injunction preventing this withholding. *St. Mary Hospital,* 89 B.R. at 512. HHS appealed the *St. Mary Hospital* ruling, asserting that its withholding was proper. The district court vacated the bankruptcy judge's order and disposed of the action by approving a settlement agreement between the parties. The court did not reach the merits of the withholding issue.

**7.** This section states:

On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

(1) for cause, including the lack of adequate protection for an interest in property of such party in interest....

11 U.S.C. § 362(d).

ruptcy court, adjudging the record inadequate to support a finding of discrimination in violation of Bankruptcy Code section 525(a). *University Medical Center v. Sullivan*, 122 B.R. 919 (E.D.Pa.1990). Instead, the district court anchored its affirmance on its conclusions (1) that UMC had not assumed the provider agreement because, as an executory contract, assumption of that agreement had to receive formal court approval, (2) that the Department's withholding did not fall within the equitable doctrine of recoupment because the pre-petition overpayments arose from different transactions than did the post-petition Medicare reimbursement, and (3) that equity controls the relationship between debtor and creditor if, during the period between a bankruptcy filing and the assumption or rejection of an executory contract, performance under the contract continues. However, the district court reversed the bankruptcy court's award of attorneys' fees and costs to UMC, finding that the Department's violation of the automatic stay was not willful as is required for such an award made under Bankruptcy Code section 362(h). The district court also denied the parties' motions for reconsideration. *University Medical Center v. Sullivan*, 125 B.R. 121 (E.D.Pa.1991). Judgment was stayed pending appeal.

Both parties filed timely notices of appeal to this court. We review the district court's decision under the same standards employed by the district court in reviewing the bankruptcy court's decision. Thus our review of the district court's conclusions of law is plenary. We review findings of fact under the clearly erroneous standard. *In re Nelson Co.*, 959 F.2d 1260, 1263 (3d Cir.1992).

### III. JURISDICTION

■ The Secretary now takes issue with our ability to exercise jurisdiction over this

case and contends that neither the bankruptcy court nor the district court properly had jurisdiction over UMC's claims.[8] In particular, he contends that UMC's claims arise under the Medicare statute and points to 42 U.S.C. § 405(h), made applicable to Medicare claims by 42 U.S.C. § 1395ii, which precludes judicial review of any "claim arising under" the Medicare statute prior to the exhaustion of administrative remedies.[9] Because we agree with UMC that the Bankruptcy Code supplies an independent basis for jurisdiction in this case, we reject the Secretary's arguments and find that the district and bankruptcy courts properly had jurisdiction under 28 U.S.C. §§ 157, 158 and 1334 and that we may properly exercise jurisdiction over this appeal under 28 U.S.C. §§ 158(d) and 1291.

■ The Medicare Act establishes an administrative channel of redress for health care providers dissatisfied with their reimbursement determinations. If a provider disputes an intermediary's final determination of the reimbursement due for a fiscal year and the amount in controversy exceeds $10,000, the provider can, within 180 days, request a hearing before the Provider Reimbursement Review Board. 42 U.S.C. § 1395*oo* (a). The Board's decision is then subject to review by the Secretary. After exhausting these procedures, a provider may seek judicial review of the final agency determination. 42 U.S.C. § 1395*oo* (f)(1). *See, e.g., Abington Memorial Hosp. v. Heckler*, 750 F.2d 242, 244 (3d Cir.1984), *cert. denied*, 474 U.S. 863, 106 S.Ct. 180, 88 L.Ed.2d 149 (1985). Prior to the exhaustion of this administrative channel of review, no court has jurisdiction over claims arising under the Medicare Act.

Neither party contends that these administrative procedures were in fact exhausted

---

**8.** We note that the Secretary's answer to UMC's bankruptcy court complaint did not contest that court's jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334.

**9.** Section 405(h) provides:

The findings and decision of the Secretary after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Secretary

shall be reviewed by any person, tribunal, or governmental agency except as herein provided. No action against the United States, the Secretary, or any officer or employee thereof shall be brought under section 1331 or 1346 of Title 28 to recover on any claim arising under this subchapter.

42 U.S.C. § 405(h) (1988).

in this case. Our ability to exercise jurisdiction over this appeal thus turns on whether UMC's claims actually arise under the Medicare statute. The Supreme Court has construed the "claim arising under" language of section 405(h) broadly to encompass any claims in which "both the standing and the substantive basis for the presentation" of the claims is the Medicare Act. *Heckler v. Ringer*, 466 U.S. 602, 615, 104 S.Ct. 2013, 2022, 80 L.Ed.2d 622 (1984) (quoting *Weinberger v. Salfi*, 422 U.S. 749, 760–61, 95 S.Ct. 2457, 2464–65, 45 L.Ed.2d 522 (1975)). According to the Secretary, both requirements are satisfied in this case: the complaint seeks a money judgment in payment for health care services provided by UMC to Medicare beneficiaries and the reimbursement sought by UMC conforms to the rates established by the Medicare Act.

UMC responds that the administrative review channel set forth in the Medicare Act and regulations is available only for claims brought by a provider when dissatisfied with final reimbursement determinations of the fiscal intermediary. *See* 42 C.F.R. § 405.1841 (1991) (a request for a Board hearing "must identify the aspects of the determination with which the provider is dissatisfied, explain why the provider believes the determination is incorrect in such particulars, and be accompanied by any documenting evidence the provider considers necessary to support its position"). This case, however, does not raise that type of claim, because the parties do not dispute the amount of reimbursement due for any cost reporting period. In fact, the parties stipulated both to the amounts of the overpayments made to UMC and to the separate pursuit of any substantive dispute concerning these amounts through the normal administrative processes set forth in the Medicare statute. Due to the fact that its adversary proceeding was based on the contention that HHS violated the automatic stay provision of the Bankruptcy Code, UMC maintains that its claims arose under the Bankruptcy Code, not the Medicare Act. Thus, the mandate of section 405(h) that the Medicare Act's administrative review procedures be exhausted before judicial review is sought simply does not apply to this case.

We agree with UMC. Its challenge to the Secretary's attempt to recover pre-petition overpayments through post-petition withholding is not inextricably intertwined with any dispute concerning the fiscal intermediary's reimbursement determinations. If UMC had not filed for bankruptcy, there would be no dispute concerning the monies due to HHS or the method for recovering them. Neither party questions the amount of pre-petition overpayments made to UMC nor any other determination of the fiscal intermediary that might be appealed to the Provider Reimbursement Review Board. Nor does either party take issue with the procedure by which the statute provides for making routine adjustments with a non-bankrupt provider for prior over or underpayments. *See* 42 U.S.C. § 1395g(a). This issue is only before us because UMC filed for bankruptcy and now claims that the withholding violated the automatic stay. We find, therefore, that UMC's claim arises under the Bankruptcy Code and not under the Medicare statute.

■ In doing so, we recognize that a broad reading of section 405(h) might accord with Congress' intent to allow "the Secretary in Medicare disputes to develop the record and base decisions upon his unique expertise in the health care field. The misfortune that a provider is in bankruptcy when he has a reimbursement dispute with the Secretary should not upset the careful balance between administrative and judicial review." *In re St. Mary Hosp.*, 123 B.R. 14, 17 (E.D.Pa.1991). However, a finding that jurisdiction is proper in this case does not impinge upon this authority of the Secretary protected by section 405(h). Indeed, there is no danger of rendering the administrative review channel superfluous, for there is no system of administrative review in place to address the issues raised by UMC in its adversary proceeding. Thus we agree with the Ninth Circuit that "where there is an independent basis for bankruptcy court jurisdiction, exhaustion of administrative remedies pursu-

ant to other jurisdictional statutes is not required." *In re Town & Country Home Nursing Servs. Inc.*, 963 F.2d 1146, 1154 (9th Cir.1991). This conclusion advances the congressionally-endorsed objective of "the effective and expeditious resolution of all matters connected to the bankruptcy estate." *Id.* at 1155. *See also* H.R.Rep. No. 595, 95th Cong., 1st Sess. 43–48, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5963, 6004–08. The Secretary's attack on the ability of the judicial system to resolve UMC's claims thus fails.

## IV. DISCUSSION

Having determined that we do have jurisdiction to hear this appeal, we must next consider whether the Department's withholding of UMC's post-petition payments violated the automatic stay provision of the Bankruptcy Code. To resolve this question we undertake a multiple-step analysis. First, does the automatic stay apply to government entities. Second, if it does, did UMC, after it filed for bankruptcy, assume its provider agreement. An important aspect of this second issue is whether formal court approval is a prerequisite to assumption of an executory contract pursuant to section 365 of the Bankruptcy Code. Third, even if the automatic stay is applicable and the agreement was not assumed, did HHS's withholding fall within the scope of the recoupment doctrine. Finally, if we find that the recoupment doctrine does not apply, does equity control the post-petition relationship between UMC and HHS; and, if it does, is HHS permitted under the provisions of the Medicare Act to reimburse a provider without making adjustments for past overpayments.

### A. *The Automatic Stay*

■ The automatic stay is one of the fundamental debtor protections supplied by the Bankruptcy Code. *In re Atlantic Business & Community Corp.*, 901 F.2d 325, 327 (3d Cir.1990). Codified in section 362, the stay "prohibits, inter alia, the com-

mencement or continuation of a judicial or administrative proceeding against the debtor that could have been initiated before the petition was filed, or to recover on a claim that arose pre-bankruptcy." *United States v. Nicolet, Inc.*, 857 F.2d 202, 207 (3d Cir. 1988). The stay

gives the debtor a breathing spell from his creditors. *It stops all collection efforts, all harassment, and all foreclosure actions.* It permits a debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy.

*In re Schwartz*, 954 F.2d 569, 571 (9th Cir.1992) (quoting H.R.Rep. No. 595, 95th Cong., 1st Sess. 340 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5963, 6296–97). Thus, it is designed to replace the "unfair race to the courthouse" with orderly liquidation that treats all creditors equally. *Nicolet*, 857 F.2d at 207.

In drafting the Bankruptcy Code, Congress subjected the government, acting as creditor, to the limitations of the automatic stay provision. By its terms, section 362(a) applies to "all entities." 11 U.S.C. § 362(a). The Bankruptcy Code defines the term "entity" as including governmental units. 11 U.S.C. § 101(14). *See, e.g., In re Pearson*, 917 F.2d 1215, 1216 (9th Cir. 1990), *cert. denied,* — U.S. ——, 112 S.Ct. 1291, 117 L.Ed.2d 514 (1992); *In re Parr Meadows Racing Ass'n*, 880 F.2d 1540, 1545 (2nd Cir.1989), *cert. denied,* 493 U.S. 1058, 110 S.Ct. 869, 107 L.Ed.2d 953 (1990); *Penn Terra Ltd. v. Department of Envtl. Resources*, 733 F.2d 267, 271–72 (3d Cir. 1984) ("the fact that Congress created an exception to the automatic stay for certain actions by governmental units itself implies that such units are otherwise affected by the stay"). Government agencies are only excepted from the reach of the automatic stay when proceeding "to enforce such governmental unit's police or regulatory power." [10] 11 U.S.C. § 362(b). Congress intended this exception to apply

---

**10.** Section 362(b) states that the filing of a bankruptcy petition does not operate as a stay

(4) under subsection (a)(1) of this section, of the commencement or continuation of an action or proceeding by a governmental unit to

where a governmental unit is suing a debtor to prevent or stop violation of fraud, environmental protection, consumer protection, safety, or similar police or regulatory laws, or attempting to fix damages for violation of such law.

H.R.Rep. No. 595, 95th Cong., 1st Sess. 343 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6299; S.Rep. No. 989, 95th Cong., 2d Sess. 52, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5838. Neither the language of section 362(b) nor its legislative history indicates that this exception was intended to permit government agencies to enforce *contractual* rights against a debtor without first seeking relief from the automatic stay. *See In re Corporacion de Servicios Medicos Hospitalarios*, 805 F.2d 440, 445 (1st Cir.1986).[11] The Department's withholding of UMC's Medicare payments certainly did not fall within this police power exception to the stay, and the Secretary does not contend as much. Thus, unless we can conclude either that UMC assumed its provider agreement or that HHS was entitled to recoup the pre-petition overpayments through withholding UMC's post-petition reimbursement, HHS was constrained by the automatic stay.

### B. *Assumption of the Provider Agreement*

■ Bankruptcy Code section 365 empowers a trustee or debtor in possession,[12] "subject to the court's approval," to "as-sume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).[13] This section is designed to "allow[ ] the trustee or debtor in possession a reasonable time within which to determine whether adoption or rejection of the executory contract would be beneficial to an effective reorganization." *In re Whitcomb & Keller Mortg. Co.*, 715 F.2d 375, 379 (7th Cir.1983). During this period, the terms of an executory contract are temporarily unenforceable against the debtor. *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 532, 104 S.Ct. 1188, 1199, 79 L.Ed.2d 482 (1984).

■ Assumption of the executory contract requires the debtor to accept its burdens as well as permitting the debtor to profit from its benefits. Consequently, if UMC assumed its provider agreement, there is no question that HHS could withhold UMC's post-petition reimbursement in order to recover pre-petition overpayments without violating the automatic stay. Through executing a provider agreement, a hospital accepts the "burden" of allowing HHS to recover the amount of prior overpayments from Medicare reimbursement currently due. Rejection, on the other hand, both cuts off any right of the contracting creditor to require the estate to perform the remaining executory portions of the contract and limits the creditor's claim to breach of contract. *Leasing Serv. Corp. v. First Tennessee Bank Nat'l Commonwealth Cos.*, 913 F.2d 518, 524 (8th Cir.1990). The Secretary's withholding of UMC's Medicare payments falls within this definition.

---

enforce such governmental unit's police or regulatory power;
(5) under subsection (a)(2) of this section, of the enforcement of a judgment, other than a money judgment, obtained in an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power.
11 U.S.C. § 362(b).

**11.** In fact, the legislative history of this provision draws a distinction between two types of police or regulatory action: "(1) actions in which the government seeks to protect public health, safety, and welfare, and (2) actions in which the government seeks to protect a pecuniary interest." *Medicos Hospitalarios*, 805 F.2d at 445 n. 4. Section 362(b)(4) exempts only the former from the automatic stay. *Id.* An action to protect a pecuniary interest has been defined as "one which directly conflicts with the bankruptcy court's control of that property." *In re*

**12.** Although this section refers only to a trustee's power to assume an executory contract, Bankruptcy Code section 1107 gives the same power to a debtor in possession.

**13.** Although the Bankruptcy Code does not define "executory contract," the Code's legislative history states that this term "generally includes contracts on which performance remains due to some extent on both sides." H.R.Rep. No. 595, 95th Cong., 1st Sess. 347 (1978); S.Rep. No. 989, 95th Cong.2d Sess. 58 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5844, 6303. *See also Sharon Steel Corp. v. National Fuel Gas Distribution Corp.*, 872 F.2d 36, 39 (3d Cir.1989). A Medicare provider agreement easily fits within this definition.

*Ass'n*, 826 F.2d 434, 436 (6th Cir.1987). The district court concluded that formal court approval is required to effect an assumption of an executory contract in accord with the terms of section 365. Because UMC never sought court approval of its assumption of the provider agreement, the court found that this agreement was never assumed and, as a result, that its reimbursement overpayment provisions could not be enforced against UMC. We agree with this conclusion.

The Secretary contends, however, that, due to the detailed Medicare statutory scheme, a provider agreement is a unique type of executory contract that a debtor should be deemed to assume in accord with section 365 whenever performance under the agreement is continued beyond the filing of a bankruptcy petition, regardless of whether formal court approval is sought. Because, in the Secretary's view, court approval was not required to effect UMC's assumption of its provider agreement, the over-payments to UMC were properly withheld; UMC impliedly assumed the agreement, and a debtor that assumes the benefits of an executory contract cannot escape shouldering the burdens of that contract as well.

To buttress this argument, the Secretary points to the text of the Medicare statute and its implementing regulations. These state that a provider agreement remains in effect until either the provider ceases to do business or the agreement is formally terminated by the provider or the Secretary.[14] This requirement, the Secretary explains, is designed to ensure that important Medicare interests are not compromised by uncertainty concerning a hospital's status as a Medicare provider and to preserve the Department's statutory authority to enforce prescribed standards covering patient care, quality control, reimbursement, and coverage.

We cannot agree that the complexity of the Medicare scheme mandates a finding that court approval is unnecessary for the assumption of a provider agreement pursuant to section 365. By its terms, section 365 "includes all executory contracts except those expressly exempted." *Bildisco*, 465 U.S. at 521, 104 S.Ct. at 1194. No express exemption exists for contracts formed with the government,[15] and courts often have assumed, without discussion, that the ability of a debtor to assume or reject an executory contract pursuant to section 365 extends equally to contracts formed with the government.[16] *See, e.g.,*

---

14. Specifically, the Medicare Act provides:
A provider of services may terminate an agreement with the Secretary under this section at such time and upon such notice to the Secretary and the public as may be provided in regulations, except that notice of more than six months shall not be required.
42 U.S.C. § 1395cc(b)(1).

15. Section 365(c)(1) does state that a debtor may not assume an executory contract if "applicable law excuses a party, other than the debtor, to such contract, ... from accepting performance from ... an entity other than the debtor or the debtor in possession [and] ... such party does not consent to such assumption." 11 U.S.C. § 365(c)(1). Certain government contracts fall within this exemption as a consequence of the Anti–Assumption Act, 41 U.S.C. § 15, which states in relevant part:
No [government] contract ... or any interest therein, shall be transferred by the party to whom such contract ... is given to any other party, and any such transfer shall cause the annulment of the contract ... transferred, so far as the United States are concerned.
*See, e.g., United States Dep't of Air Force v. Carolina Parachute Corp.*, 907 F.2d 1469, 1472–

73 (4th Cir.1990). The Secretary, however, does not contend that the Anti–Assumption Act is a factor in this case.

16. In confronting the analogous question of whether section 365 is available to a debtor seeking to assume a contract for the provision of governmental services that the government desires to terminate, the First Circuit concluded:
We find nothing in the code or subsequent case law to persuade us that debtors with government contracts should be denied the opportunity to assume those contracts. Nor do we believe that government agencies, after choosing to contract with private corporations, should receive more favorable treatment than other similarly situated parties. The "police power" exception to the automatic stay, section 362(b)(4), (5), sufficiently protects the regulatory power of government agencies. *Given these protections, we see no reason why section 365 should not apply with full force to permit the assumption or rejection of government contracts by debtors.*
*Medicos Hospitalarios*, 805 F.2d 440, 447 n. 10 (1st Cir.1986) (emphasis added). We find this rationale persuasive.

*United States Dep't of Air Force v. Carolina Parachute Corp.*, 907 F.2d 1469, 1472 (4th Cir.1990) (analyzing the government's contract with the debtor under section 365); *In re West Electronics, Inc.*, 852 F.2d 79, 82 (3d Cir.1988) (commenting, in the context of a debtor's contract with the government, that "in general ... under 11 U.S.C. § 365 West as a debtor in possession could assume an executory contract with court approval"); *In re Harris Management Co.*, 791 F.2d 1412, 1414 (9th Cir.1986) (same).

■ Moreover, to circumscribe a debtor's power of assumption Congress has legislated special treatment for the assumption and rejection of collective bargaining agreements, 11 U.S.C. § 1113, and for the rejection of certain real property leases, 11 U.S.C. § 365(h). *See, e.g., Sharon Steel Corp. v. National Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir.1989). Congress' failure to legislate special treatment for the assumption or rejection of Medicare provider agreements indicates that assumption of these agreements, like that of other executory contracts, should be deemed subject to the requirements of section 365, unless and until Congress decides otherwise. *Cf. Bildisco*, 465 U.S. at 522, 104 S.Ct. at 1194 (concluding that because Congress did not draft an exclusion for collective bargaining agreements from the terms of section 365, Congress intended section 365 apply to those agreements).[17] Thus, a provider agreement can only be assumed by a debtor hospital in accord with the terms of section 365. *But see In re Advanced Professional Home Health Care, Inc.*, 94 B.R. 95, 97 (E.D.Mich.1988) (holding that through continuing to serve Medicare patients a debtor hospital obviates the need for strict compliance with the terms of § 365).

■ We have generally treated court approval as a prerequisite to a debtor's assumption of an executory contract. *See e.g., Counties Contracting & Constr. Co. v. Constitution Life Ins. Co.*, 855 F.2d

1054, 1060 (3rd Cir.1988) (finding court approval "mandated for effective assumption under [§ 365(a) ]"). Formal court approval of assumption of the provider agreement was neither sought nor granted in this case. As a result, UMC maintains that the agreement was never assumed but that such approval is necessary to effect the purpose of section 365(a). UMC's position is consistent with the interpretation we have given to section 365(a) in cases such as *Counties Contracting*. In order to insure that a debtor has the opportunity to assess the advantages and disadvantages of assuming a contract, assumption must be approved. It cannot be presumed. As will be developed below, we acknowledge that the interests articulated by the Secretary are integral to the Medicare system and cannot merely be jettisoned in the wake of a provider's filing in bankruptcy. At the same time, however, there are definite interests protected by Bankruptcy Code section 365 that HHS completely discounts.

■ In particular, the Secretary asserts that no purpose contemplated by Congress is advanced by requiring court approval of the assumption of a provider agreement when the debtor, without objection from creditors, voluntarily continues to render Medicare services. By so doing, the debtor hospital manifests its decision that continuation of the agreement is in the best interest of the estate. Thus, the Secretary contends, no further opportunity is needed for the exercise of the debtor's business judgment in deciding whether the contract is beneficial. Moreover, the Secretary opines that creditors would suffer no discernible prejudice if continued performance by a debtor hospital were adjudged an implied assumption of the agreement. Rather than removing money from the estate and thus decreasing the funds available for distribution to a hospital's creditors, the assumption of a provider agreement insures that additional Medicare revenues will flow into the estate. For these reasons, the Secre-

---

17. In response to the *Bildisco* decision, Congress enacted Bankruptcy Code section 1113 to govern the means by which a debtor may assume, reject or modify its collective bargaining agreement. 11 U.S.C. § 1113(a), (b), & (e).

tary claims that creditors are in no way harmed by such an assumption.

These arguments misapprehend the interests of creditors that can be implicated through the assumption of a provider agreement. Indeed, it is conceivable that creditors of a debtor hospital may well benefit from a decision to reject such an agreement. Rejection or assumption of an executory contract determines the status of the contracting creditor's claim, namely whether "it.is merely a pre-petition obligation of the debtor, or is entitled to priority as an expense of administration of the estate." *Leasing Serv. Corp.*, 826 F.2d at 437. Prior to assumption, HHS is. in a position equivalent to general unsecured creditors: its recovery of pre-petition debt depends upon the amount left in the bankrupt's estate after secured and priority creditors.are satisfied, and so is unlikely to be one hundred cents on the dollar. In contrast, if the provider agreement. is assumed, HHS, like other parties to assumed executory contracts, effectively "gains an administrative priority" against the estate. 1 COLLIER BANKRUPTCY MANUAL § 365.01, at 365–2 (Lawrence P. King ed., 3rd ed. 1992). *See also, In re Taylor*, 913 F.2d 102, 106–07 (3d Cir.1990).

In this case, HHS has asserted a right to recover overpayments to UMC totaling more than $800,000 for the period 1985 through 1987. However, after UMC negotiated the oral repayment arrangement with HHS on February 18, 1988, UMC survived as a going concern for only six weeks. Given UMC's precarious financial position in February of 1988, the realistic result of an assumption of the provider agreement might have been to enhance temporarily UMC's post-petition coffers by a few hundred thousand dollars. At the same time, this assumption would significantly improve the status of the Secretary's pre-petition debts at the direct expense of all other unsecured creditors. Alternatively, though a rejection of the agree-

ment would preclude the receipt of long-term future Medicare revenues, HHS still would have been required to pay for any services rendered post-petition. Moreover, HHS then would have been treated in a manner equal to other unsecured creditors in the asset . distribution for pre-petition debts. Thus, it is disingenuous to conclude that the interests of UMC's other creditors would not be affected if a provider agreement is automatically assumed when a debtor hospital continues to treat Medicare patients after filing for bankruptcy.

Furthermore, such a holding would thrust a Medicare provider contemplating bankruptcy into a dilemma. Immediately upon filing a bankruptcy petition and without the benefit of a reasonable period for financial reflection as contemplated by section 365, a hospital would be forced to decide whether to assume or reject its provider agreement. If the provider chooses to continue service of Medicare patients for any period of time, regardless of its prospects for a successful reorganization, it would be deemed to have assumed the provider agreement, thereby assuring HHS an administrative priority over all general creditors. Alternatively, the provider could choose to terminate Medicare services and immediately reject the agreement, thereby in all likelihood abandoning any hope for a successful reorganization. Despite the Secretary's protestations, we cannot deem such a result to be mandated by the Medicare statutory scheme; nor is it one contemplated by the Bankruptcy Code. *Accord In re Memorial Hosp. of Iowa County*, 82 B.R. 478, 484 (W.D.Wis.1988) ("[r]ecognition of an exception to the requirement of court approval of assumption of executory contracts nullifies the clear and unambiguous statutory language of sections 362 and 365").

We also find it significant that Bankruptcy Code section 365(d)(2) [18] enables a creditor, at any time after a bankruptcy petition

---

**18.** Section 365(d)(2) states, in pertinent part: In a case under chapter 9, 11, 12, or 13 of this title, the trustee may assume or reject an executory contract ... at any time before the confirmation of a plan but the court, on the

request of any party to such contract ..., may order the trustee to determine within a specified period of time whether to assume or reject such contract or lease.
11 U.S.C. § 365(d)(2).

is filed, to move the court to compel the debtor's assumption or rejection of an executory contract. Congress intended this provision to "prevent parties in contractual or lease relationships with the debtor from being left in doubt concerning their status vis-a-vis the estate." S.Rep. No. 989, 95th Cong., 2d Sess. 59 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5845. Here the district court specifically noted that HHS never moved the bankruptcy court to compel UMC either to assume or reject the provider agreement. *See University Medical Center,* 125 B.R. at 124. Particularly in this situation, where the creditor has failed to avail itself of the procedure supplied by the Bankruptcy Code for compelling a debtor's decision on an executory contract, we find it inappropriate to announce a new rule that a debtor hospital's continued treatment of Medicare patients results in an implied assumption of its provider agreement.[19] Thus, we conclude that UMC did not assume its provider agreement at any time after filing its petition in bankruptcy. As a result, the Department's withholding of UMC's post-petition reimbursement did violate the automatic stay.

### C. *Recoupment*

HHS contends, however, that under the equitable doctrine of recoupment, it still should be able, without violating the automatic stay, to recover pre-petition overpayments by withholding UMC's post-petition reimbursement. The Secretary is correct that recoupment is an equitable exception to the automatic stay. Thus, if the Secretary's acts come within the scope of this doctrine, the withholding of UMC's post-petition Medicare reimbursement to recover prior overpayments would be proper, even though the provider agreement was not assumed. The district court found that the Department's withholding could

not be deemed to fall within the purview of recoupment, and we agree. As a consequence, this attempt to circumvent the automatic stay also fails.

To grasp the scope of the recoupment doctrine, it is helpful first to distinguish recoupment from a creditor's ability to set off certain claims. The doctrine of setoff, as incorporated in Bankruptcy Code section 553, gives a creditor the right "to offset a mutual debt owing by such creditor to the debtor," provided that both debts arose before commencement of the bankruptcy action and are in fact mutual. *In re Davidovich,* 901 F.2d 1533, 1537 (10th Cir. 1990). "Setoff, in effect, elevates an unsecured claim to secured status, to the extent that the debtor has a mutual, pre-petition claim against the creditor." *Lee v. Schweiker,* 739 F.2d 870, 875 (3d Cir.1984). Generally, the mutual debt and claim are the product of different transactions. 4 COLLIER ON BANKRUPTCY § 553.03, at 553–14 (Lawrence P. King ed., 15th ed. 1992). Pursuant to the limitations imposed by Code section 553, a creditor's pre-petition claims against the debtor cannot be set off against post-petition debts owed to the debtor. *Id.*

The Bankruptcy Code does not contain a recoupment provision. The common law doctrine of recoupment provides an exception to setoff in bankruptcy cases. Recoupment "is the setting up of a demand *arising from the same transaction* as the plaintiff's claim or cause of action, strictly for the purpose of abatement or reduction of such claim." 4 COLLIER ON BANKRUPTCY § 553.03, at 553–15–17 (emphasis added). This doctrine is justified on the grounds that "where the creditor's claim against the debtor arises from the same transaction as the debtor's claim, it is essentially a defense to the debtor's claim

---

19. We acknowledge that a number of bankruptcy and district courts have held that as a consequence of the unique Medicare statutory scheme, a debtor hospital "could not continue as a provider following the filing of a petition for reorganization ... unless it effectively assumed the obligations of the provider agreement under which it had previously been operating." *Advanced Professional Home Health* *Care,* 94 B.R. at 96. *See also In re Tidewater Memorial Hosp., Inc.,* 106 B.R. 876, 883–84 (Bankr.E.D.Va.1989); *In re Yonkers Hamilton Sanitarium,* 22 B.R. 427, 435 (Bankr.S.D.N.Y. 1982), *aff'd* 34 B.R. 385 (S.D.N.Y.1983); *In re Monsour Medical Center,* 8 B.R. 606, 615 (Bankr. W.D.Pa.), *aff'd* 11 B.R. 1014 (W.D.Pa.1981). To the extent that these holdings can not be distinguished, we part from their rationale.

against the creditor rather than a mutual obligation, and application of the limitations on setoff in bankruptcy would be inequitable.'' *Lee*, 739 F.2d at 875. Thus, so long as the creditor's claim arises out of the identical transaction as the debtor's, that claim may be offset against the debt owed to the debtor, without concern for the limitations put on the doctrine of setoff by Code section 553. *Davidovich*, 901 F.2d at 1537. In the bankruptcy context, recoupment has often been applied where the relevant claims arise out of a single contract "that provide[s] for advance payments based on estimates of what ultimately would be owed, subject to later correction." *In re B & L Oil Co.*, 782 F.2d 155, 157 (10th Cir.1986). However, an express contractual right is not necessary to effect a recoupment. *See In re Holford*, 896 F.2d 176, 178 (5th Cir.1990). Nor does the fact that a contract exists between the debtor and creditor automatically enable the creditor to effect a recoupment.

■ The district court correctly noted that the Department's withholding could not be termed a valid setoff: there is no doubt that section 553 prohibits the Department's *pre-petition* overpayments from being set off against the Department's *post-petition* debts to UMC. Thus the court turned to the question of whether the 1985 overpayments were part of the same transaction as UMC's claims for 1988 reimbursement; if so, HHS properly could effect a recoupment without controverting the automatic stay. We agree with the district court's conclusion that these claims were not part of a single transaction.

■ The Medicare account reconciliation process supports this conclusion. The relevant regulations state that each provider cost-year is subject to a distinct annual audit, which follows the submission of a separate cost report for each fiscal year. *See* 42 C.F.R. §§ 413.20(b), 413.24(f) (1991). These regulations indicate that reimbursement payments made for any one year arise from transactions wholly distinct from reimbursement payments made for subsequent years.

The Secretary contends, nevertheless, that the text of the Medicare statute itself evinces the error of the district court's conclusion. In particular, the Secretary advances that portion of the Medicare statute which provides:

> The Secretary shall periodically determine the amount which should be paid under this part to each provider of services with respect to the services furnished by it, and the provider of services shall be paid, at such time or times as the Secretary believes appropriate (but not less often than monthly) and prior to audit or settlement by the General Accounting Office, from the Federal Hospital Insurance Trust Fund, the amounts so determined, with necessary adjustments on account of previously made overpayments or under payments....

42 U.S.C. § 1395g(a). According to the Secretary, this language renders each claim for Medicare reimbursement both subject to and contingent upon the Department's right to recover prior overpayments. It establishes the "mutuality of obligation" necessary for recoupment. Furthermore, the Secretary asserts that Medicare's reimbursement methodology is predicated on the principle that a provider has an ongoing legal relationship to the program that enables it to receive a stream of estimated payments subject to reconciliation at a later date. Because overpayments are a contemplated element of this relationship, HHS in each instance must consider prior overpayment as a factor determining the amount due on a subsequent claim for reimbursement. In the Secretary's view, this type of relationship cannot be parsed into a series of transactions, but instead amounts to one continuous transaction between the provider and HHS.

In an effort to bring the Department's post-petition withholding within the purview of the recoupment doctrine, the Secretary advocates an expansive definition of "transaction." He supports his position with citations from our decision in *Lee* and a discussion of compulsory counterclaims in *United States v. Aquavella*, 615 F.2d 12

(2d Cir.1979). The Secretary contends that the same "broad and flexible standard" employed to determine the scope of compulsory counterclaims should be utilized to determine the applicability of recoupment in the bankruptcy setting.

■ We find that the open-ended standard, endorsed in the context of discerning compulsory counterclaims, is inadequate for determining whether two claims arise from the same transaction for the purposes of equitable recoupment in bankruptcy. Indeed, in *Lee* we stressed that both setoff and recoupment play very different roles in bankruptcy than in their original roles as rules of pleading. *Lee,* 739 F.2d at 875. For the purposes of recoupment, a mere logical relationship is not enough: the "fact that the same two parties are involved, and that a similar subject matter gave rise to both claims, ... does not mean that the two arose from the 'same transaction.'" *Id.* Rather, both debts must arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of that transaction without also meeting its obligations. Use of this stricter standard for delineating the bounds of a transaction in the context of recoupment is in accord with the principle that this doctrine, as a non-statutory, equitable exception to the automatic stay, should be narrowly construed. *See B & L Oil,* 782 F.2d at 158.

■ Applying this circumscribed definition of "transaction," we find that the ongoing relationship that exists between a Medicare provider and HHS is not sufficient to support the conclusion that Medicare overpayments made to UMC in 1985 arise from the same transaction, for the purposes of equitable recoupment, as Medicare payments due UMC for services provided in 1988. The 1988 payments were independently determinable and were due for services completely distinct from those reimbursed through the 1985 payments. Further, the entire account reconciliation process established by the Medicare Act and regulations works on an annual basis. As the district court explained:

The Provider Agreement is a unique type of contract. It does not provide for a defined transaction or even a series of transactions. It simply establishes a relationship between the parties: if UMC treats eligible patients, HHS will reimburse them for their costs. Under the agreement, the parties established an arrangement for payment, with HHS providing reimbursement with respect to each patient treated. The arrangement called for the payments to be estimates and thus contemplated that over time an overpayment or underpayment might result, creating a debt in one or the other party. The arrangement called for this debt to be calculated on an annual basis. The result is that the overpayment debt presently owed by UMC is distinct from and bears no direct relation to the particular claims for reimbursement for services performed post-petition.

*University Medical Center,* 122 B.R. at 930.

Unlike the payment arrangement established by a provider agreement, the typical situation in which equitable recoupment can be invoked involves a credit and debt arising out of a transaction for the same goods or services. For example, in *Waldschmidt v. CBS, Inc.,* 14 B.R. 309 (M.D.Tenn.1981), the court held that under the recoupment doctrine a recording company was able to reduce the royalties it owed a bankrupt recording artist by the amount of pre-petition advance payments it had made to that artist in anticipation of an album. In such a case, the advance payments envisioned the album. In contrast, HHS would have made the same estimated payments to UMC in 1985 regardless of the number of Medicare patients UMC expected to serve in the future. The 1985 overpayments, therefore, cannot be deemed advance payments for UMC's post–1985 services.

The relationship between HHS and a Medicare provider entails transactions that last over an extended period. However, each of these transactions begins with services rendered by the provider to a Medicare patient, includes payment to the provider, and concludes with HHS's recovery

of any overpayment. Recovery of the 1985 overpayment, therefore, is the final act of the transactions that began in 1985. UMC's 1988 post-petition services were the beginning of transactions that would stretch into the future, but they were not part of the 1985 transactions. To conclude that these claims arose from the same transaction for the purposes of equitable recoupment would be to contort that doctrine beyond any justification for its creation. We conclude that the Department's post-petition withholding of the amount previously overpaid to UMC cannot be considered as equitable recoupment.[20] *Accord In re Memorial Hosp.*, 82 B.R. 478, 483–84 (W.D.Wis.1988). *But see In re Yonkers Hamilton Sanitarium Inc.*, 34 B.R. 385, 387–88 (S.D.N.Y.1983); *In re Visiting Nurse Ass'n*, 121 B.R. 114, 118–19 (Bankr. M.D.Fla.1990).

### D. *The Reasonable Value of UMC's Services*

Having determined that the automatic stay precluded HHS from withholding payment for post-petition services in order to recoup past overpayments and that the provider agreement was not assumed by UMC, we next must consider whether UMC is nevertheless entitled to payment for the reasonable value of the services it provided post-petition. UMC, as debtor-in-possession, continued to provide services to Medicare patients. Is HHS, as a result, required to pay for these services despite the lack of a formal assumption of the provider agreement? UMC argues that, pursuant to the Supreme Court's reasoning in *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), equity controls its post-petition, pre-assumption relationship with the Department, and it is therefore entitled to payment. The Secretary counters that *Bildisco* applies only to the relationship between private parties and has no bearing on the special rules that govern contractual or statutory relation-

ships with the United States. He urges that the law prohibits the imposition of equity-based money remedies against the federal government. The Secretary further concludes that UMC can only receive reimbursement in accord with the terms of a provider agreement. This contention is based on the language of the Medicare Act: a provider cannot receive Medicare reimbursement unless a provider agreement is in effect.[21]

We find that both parties miss the mark in their focus on the narrow holding of *Bildisco*. Rather, it is the broad principle articulated by the *Bildisco* Court, the idea of harmonizing the policies of intersecting statutes, that supplies us with guidance. *See Bildisco*, 465 U.S. at 535, 104 S.Ct. at 1201 (Brennan, J., dissenting) (approving the majority's standard for determining when a debtor in possession can reject a collective bargaining agreement as "properly accommodat[ing] the policies of the National Labor Relations Act and the Bankruptcy Code"). Indeed, the Supreme Court has repeatedly counseled that, if two statutes are capable of co-existence, "it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1018, 104 S.Ct. 2862, 2881, 81 L.Ed.2d 815 (1984) (quotations omitted). *See also Morton v. Mancari*, 417 U.S. 535, 551, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974); *West v. Keve*, 721 F.2d 91, 96 (3d Cir.1983) ("[c]ompeting statutes should not, if at all possible, be interpreted so that the provisions of one will abrogate the provisions of another"). Our task is to "harmonize" the policies of the Bankruptcy Code's automatic stay with those of the Medicare statute's Prospective Payment System in order to define the appropriate post-petition relationship of UMC and HHS. In so doing we must reconcile these two statutes in a man-

---

**20.** We emphasize that the fact that HHS would be able to recoup these overpayments under the provider agreement, if that agreement were formally assumed, is an issue completely distinct from the question of whether HHS properly can

withhold the amount of prior overpayments from UMC's post-petition reimbursement under the equitable doctrine of recoupment.

**21.** 42 U.S.C. § 1395cc.

ner that respects the fundamental concerns of each.

In the preceding sections of this opinion, we discussed the policies behind the Bankruptcy Code's automatic stay and executory contract assumption provisions. We concluded that, with certain exceptions not applicable to this case, both of these provisions apply to the government just as to other creditors. Despite the fact that HHS, as a government agency, is subject both to the automatic stay and to the requirements of section 365, the Secretary still asks us to allow HHS to recover its pre-petition overpayments from the post-petition reimbursement due UMC and to find that UMC's claim for Medicare reimbursement must be brought under the Medicare statute. To reach the Secretary's desired result we would be required to ignore the Supreme Court's teachings in *Bildisco*—that we must harmonize the policies of the Bankruptcy Code that intersect with those of Medicare statute as a consequence of a provider's filing in bankruptcy—and to sanction a result contrary to what we have already determined in Section III A and B above.

We are aware that our task of harmonizing only begins with a consideration of the policies of the Bankruptcy Code. "Congress has repeatedly expressed its legislative determination that the trustee [or debtor-in-possession] is not to have *carte blanche* to ignore non-bankruptcy law." *Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Protection*, 474 U.S. 494, 502, 106 S.Ct. 755, 760, 88 L.Ed.2d 859 (1986). Indeed, as the Supreme Court has cautioned, a "debtor-in-possession is not relieved of all obligations under" a non-bankruptcy statute "simply by filing a petition for bankruptcy." *Bildisco*, 465 U.S. at 534, 104 S.Ct. at 1200.

The Secretary points to several interests advanced through the Medicare statutory scheme that he argues take precedence over the interests which underlie Bankruptcy Code sections 362 and 365: first, the Department's unfettered exercise of its recoupment powers is vital to the success of the Medicare statutory scheme; and, sec-

ond, Medicare's prospective reimbursement methodology, which Congress instituted "in the hope of containing mushrooming hospital reimbursement costs and encouraging more cost-efficient delivery of health care services[,]" no longer would apply to hospitals that continue to render Medicare services after filing for bankruptcy. He contends that allowing a judicially determined amount to reflect the "reasonable value" of services rendered could undercut the cost-containing goals of the Medicare reimbursement system.

The Secretary also argues that the application of the district court's interpretation of *Bildisco* to Medicare provider agreements would interfere with the Medicare program's health and safety standards and would enable debtor hospitals to evade compliance with certain civil rights laws. For example, hospitals serving as Medicare providers and responsible physicians, who negligently violate the requirements of the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd, are subject to civil money penalties. 42 U.S.C. § 1395dd(d). However, only hospitals that voluntarily participate in the Medicare program and have an effective provider agreement must comply with EMTALA. *Burditt v. United States Dep't of Health & Human Servs.*, 934 F.2d 1362, 1376 (5th Cir.1991). Prior to a debtor hospital's formal assumption of its provider agreement, in the Secretary's view, HHS would lack authority to enforce these important standards.

Finally, the Secretary is concerned that, because a debtor hospital's status as a Medicare provider would be uncertain before that agreement is either assumed or terminated, Medicare services to the community might be disrupted during the post-petition, pre-assumption period.

Each of these policies of the Medicare Act advances an interest integral to the continued operation of the Medicare scheme. We recognize that implicitly intertwined with each concern articulated by the Secretary is the fundamental purpose of the Medicare system: the provision of adequate medical treatment to the elderly and

disabled. Indeed, in enacting the 1965 amendments to the Social Security Act that have become known as the Medicare Act, Congress acknowledged that the "national problem of adequate medical care for the aged has not been met to the extent desired under existing legislation." S.Rep. No. 404, 89th Cong., 1st Sess. (1965), *reprinted in* 1965 U.S.C.C.A.N.1943, 1964. The overall purpose of these amendments was to "provide a coordinated approach for health insurance and medical care for the aged under the Social Security Act." *Id.* at 1943. This was to be effected through "an expanded medical assistance program for the needy and medically needy aged, blind, [and] disabled." *Id.* No accommodation of the intersecting policies of the Medicare Act and the Bankruptcy Code would be legitimate unless it gives full effect to these essential aims.

 Harmonizing these Medicare interests with those of the Bankruptcy Code, we conclude that, while UMC remained in business during the post-petition period, it remained a Medicare provider subject to the requirements of the Medicare Act and regulations. As such, we find that UMC was subject to the Prospective Payment System and the program's health and safety standards. Concurrently, UMC was eligible for reimbursement for all post-petition Medicare services rendered up to the time that it ceased business. While we recognize that the filing of a bankruptcy petition renders an executory contract no longer immediately enforceable, *Bildisco*, 465 U.S. at 532, 104 S.Ct. at 1199, we find that the multiple interests underlying the Medicare program mandate a conclusion that prior to formal rejection of a provider agreement, a Medicare provider must continue to comply with the requirements of the Medicare Act and regulations.[22] To hold otherwise would not only adversely impact the Medicare system but would also controvert the Supreme Court's conclusion that a bankruptcy petition filing does not relieve a debtor-in-possession of all obligations under other relevant statutes. *See Midlantic Nat'l Bank,* 474 U.S. at 502, 106 S.Ct. at 760.

This is not the equivalent of finding that Medicare provider agreements may be informally assumed. Rather, we conclude that both the Bankruptcy and the Medicare policies alike are best preserved by holding that during this post-petition period, HHS remained subject to the automatic stay and thus was not free to withhold pre-petition overpayments from UMC's post-petition reimbursement. Only if UMC formally assumed the provider agreement, or if HHS sought and received relief from the stay from the bankruptcy court pursuant to section 362(d), would such withholding be proper. The automatic stay "is a crucial provision of the bankruptcy law. It prevents disparate actions against debtors and protects creditors in a manner consistent with the bankruptcy goal of equal treatment." *Parr Meadows Racing Ass'n,* 880 F.2d at 1545. It gives effect to Congress' intent to protect debtors and creditors from "piecemeal dismemberment" of the debtor's estate. *In re Computer Communications, Inc.,* 824 F.2d 725, 731 (9th Cir.1987). Our holding preserves this fundamental debtor protection. Further, supplying a community's financially troubled Medicare provider with the opportunity to reorganize and thus continue as a going concern certainly is in the interests of that community's Medicare beneficiaries. In our view, this conclusion best harmonizes the Medicare Act's goal of providing medical care to the elderly and disabled with the Bankruptcy Code's goal of providing the debtor with a breathing spell from creditors in order to permit the debtor to attempt repayment or reorganization. Finally, we emphasize, as did the district court, that we are not holding that HHS can never recover the reimbursement overpayments made to UMC, only that HHS cannot ignore the reach of the automatic stay in its effort to attain an

22. To the extent that we find the Medicare statute applicable in this post-petition, pre-assumption period, we reject the Secretary's argument that reimbursement to the provider for services rendered during this period would be a prohibited equitable, non-contract money remedy, which is not available against the United States. *See OPM v. Richmond,* 496 U.S. 414, 110 S.Ct. 2465, 2471–72, 110 L.Ed.2d 387 (1990).

administrative priority over UMC's other general creditors. We thus will affirm the district court's order that HHS pay UMC the amount that would have been paid for UMC's post-petition services, had HHS not improperly withheld pre-petition overpayments.

### E. *Costs and Attorneys Fees*

#### 1.

The consequences of a violation of the automatic stay are detailed in Bankruptcy Code section 362(h): "[a]n individual injured by any *willful* violation of the stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(h) (emphasis added). The bankruptcy court concluded that the Department's violation of the automatic stay was willful, and so awarded attorneys' fees for the period following that court's decision in *St. Mary Hospital.* That court also assessed prejudgment interest against HHS on the withheld payments "as an aspect of a penalty" for the withholding of these payments and because it deemed such an award mandatory in a breach of contract action. *University Medical Center,* 93 B.R. at 417. On appeal the district court reversed both of these awards, reasoning that, because the law concerning the Department's right to withhold Medicare payments from a debtor hospital after the filing of a petition in bankruptcy was unsettled, the Department's violation of the automatic stay could not be deemed willful as is required for an award under section 362(h). *University Medical Center,* 122 B.R. at 931–33.

UMC appeals this conclusion of the district court. According to UMC, in light of our decision in *In re Atlantic Business and Community Corp.,* 901 F.2d 325 (3d Cir.1990), the district court's finding incorrectly saddled the debtor's estate with attorneys' fees and interest expenses which were incurred as the result of the Secretary's "willful" withholding of UMC's post-petition payments in violation of the automatic stay.

In response, the Secretary contends for the first time on appeal that HHS is immune from monetary awards made pursuant to section 362(h), and that Congress has not waived this sovereign immunity. Moreover, even assuming that the Department's sovereign immunity has been waived, the Secretary asserts that HHS should not be adjudged to have willfully violated the stay.

 A party may not waive the requirement of subject-matter jurisdiction by failing to challenge it early in the proceedings. *Insurance Corp. of Ireland v. Compagnie Des Bauxites de Guinee,* 456 U.S. 694, 702, 102 S.Ct. 2099, 2104, 72 L.Ed.2d 492 (1982). The United States, as sovereign, "is immune from suit, save as it consents to be sued ... and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Dalm,* 494 U.S. 596, 110 S.Ct. 1361, 1368, 108 L.Ed.2d 548 (1990) (quotations and citations omitted). Because a waiver of sovereign immunity is a prerequisite for jurisdiction, *United States v. Mitchell,* 463 U.S. 206, 212, 103 S.Ct. 2961, 2965, 77 L.Ed.2d 580 (1983), we must decide the issue of the Department's sovereign immunity, though it was neither presented nor considered below.

 HHS, as an agency of the United States, does enjoy immunity from suit unless the United States has waived this immunity. Waivers of sovereign immunity must be unequivocally expressed. *United States v. Nordic Village, Inc.,* — U.S. ——, 112 S.Ct. 1011, 1014, 117 L.Ed.2d 181 (1992). Such consent to be sued must be construed strictly in the government's favor and may not be enlarged beyond what the language of the waiver requires. *Id.* at ——, 112 S.Ct. at 1015 (citing *Ruckelshaus v. Sierra Club,* 463 U.S. 680, 685, 103 S.Ct. 3274, 3278, 77 L.Ed.2d 938 (1983); *McMahon v. United States,* 342 U.S. 25, 27, 72 S.Ct. 17, 19, 96 L.Ed. 26 (1951)).

Section 106 of the Bankruptcy Code provides a limited waiver of sovereign immunity for bankruptcy matters. UMC asserts that through subsections 106(a) and 106(c)

Congress has expressly waived the sovereign immunity of federal agencies with respect to awards mandated by section 362(h). Pursuant to section 106(a), "[a] governmental unit is deemed to have waived sovereign immunity with respect to any claim against such governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of which the governmental unit's claim arose." 11 U.S.C. § 106(a).

■ The Supreme Court has explained that this subsection plainly waives sovereign immunity with respect to monetary liability for compulsory counterclaims to governmental claims. *Id.* In fact, when a government agency formally invokes the jurisdiction of the bankruptcy court through filing a proof of claim, the government's exposure to counterclaim liability under section 106(a) is undisputed. *See In re Town & Country Nursing Servs., Inc.,* 963 F.2d 1146, 1150 (9th Cir.1991). In such a case, so long as the debtor's claim against the government both qualifies as property of the estate and arises out of the same transaction or occurrence as the government's claim, sovereign immunity is waived by this section.

■ As suggested by the "same transaction or occurrence" requirement of this section, and by the legislative history of the Bankruptcy Reform Act of 1978,[23] courts have looked to the standards employed in identifying compulsory counterclaims under Federal Rule of Civil Procedure 13(a) for guidance in discerning the applicability of section 106(a)'s waiver of immunity. *See Ashbrook v. Block,* 917 F.2d 918, 923 (6th Cir.1990); *In re Bulson,* 117 B.R. 537, 541 (9th Cir. BAP 1990). The operative question in determining whether a claim is a compulsory counterclaim is whether it bears a "logical relationship" to the opposing party's claim. *Xerox Corp. v.*

*SCM Corp.,* 576 F.2d 1057, 1059 (3d Cir. 1978).

UMC argues that its claim for attorneys' fees and costs comes within the purview of section 106(a)'s waiver of immunity because (1) HHS not only withheld post-petition reimbursement due to UMC, but also filed a proof of claim in bankruptcy court against the debtor's estate, and (2) UMC's claim for attorneys' fees under section 362(h) results directly from the Department's unlawful attempt to recover the very claim that is the subject of the Secretary's proof of claim, and so is part of the same transaction or occurrence.

■ We agree that the requirements of 106(a) have indeed been met in this case. First, HHS did file a proof of claim on May 13, 1988, for the amount of the overpayments made to UMC. Thus, the Secretary himself invoked the jurisdiction of the bankruptcy court. Second, UMC's claim for attorneys' fees and costs qualifies as property of the estate under Bankruptcy Code section 541.[24] Any attorneys' fees incurred as a result of the Department's violation of the automatic stay, if imposed upon UMC rather than HHS, would diminish the assets UMC could devote to the payments of prior debts. Accord, *In re Solis,* 137 B.R. 121, 126 (Bankr.S.D.N.Y. 1992); *In re Fernandez,* 132 B.R. 775, 780 (M.D.Fla.1991). Finally, UMC's claim for fees and costs arose out of the same transaction and occurrence as the Department's withholding of the pre-petition overpayments. UMC's claim for costs developed from the same set of operative facts as the Department's claim: the pre-petition overpayments made to UMC. In fact, UMC's claim arose directly from the Department's attempt to recover these overpayments, which are owed by UMC and for which the Secretary has filed a proof of claim. Both claims thus revolve around

---

**23.** This legislative history explains that "the filing of a proof of claim against the estate by a governmental unit is a waiver by that governmental unit of sovereign immunity with respect to compulsory counterclaims, as defined in the Federal Rules of Civil Procedure." S.Rep. No. 989, 95th Cong., 2d Sess. 29, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5815.

**24.** Section 541(a) states, in relevant part, that the estate encompasses "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1).

the aggregate core of facts concerning the pre-petition overpayments made to UMC.[25]

Because each of the conditions necessary for a section 106(a) waiver of sovereign immunity has been met, we conclude that the Department's immunity with regard to UMC's claim for attorneys' fees and costs has been waived.[26] *See Town & Country Home Nursing Servs.*, 963 F.2d at 1151–52 (Secretary's withholding of pre-petition Medicare overpayments from post-petition reimbursement constituted a waiver of sovereign immunity under § 106(a), even absent the filing of a formal claim in bankruptcy court). *Cf. In re Fernandez*, 132 B.R. 775, 780 (M.D.Fla.1991) (waiver of sovereign immunity pursuant to 106(a) for purposes of 362(h) award against the IRS for violation of the automatic stay); *In re Taborski*, Nos. 88–B–1624, 89–A–587, 1991 WL 236872, *2, 1991 Bankr. LEXIS 1393, *6 (Bankr.N.D.Ill.1991) (same); *United States by Farmers Home Admin. v. Ketelsen*, 104 B.R. 242, 252–53 (D.S.D.1988), *aff'd* 880 F.2d 990 (8th Cir.1989).

### 2.

■ Consequently, we must turn to the question of whether the Secretary's violation of the automatic stay was "willful." If so, UMC is entitled to recover attorneys' fees and costs. In support of its contention that HHS willfully violated the automatic stay, UMC points to our decision in *Atlantic Business*, which articulated a definition of "willful" as not requiring that there be a specific intent to violate the automatic stay, but rather that the acts violating the stay be intentional. UMC argues that because

HHS knew of the bankruptcy filing, was aware of the automatic stay, and intended to withhold post-petition payments in order to recover UMC's pre-petition debt, the Department's violation of the stay must be deemed willful.

In considering this issue, we find it helpful to analyze the facts in *Atlantic Business*, as applied to our definition there of "willfulness." The debtor Atlantic Business Community Development Corporation (ABCD) filed a petition in bankruptcy under Chapter 11. It continued, however, to operate a radio station. Cuffee, the owner of the building, studio equipment, office furnishings and record albums used by ABCD for the station, advised the trustee in bankruptcy that he, Cuffee, would no longer permit the radio station to use the building. To accomplish this, Cuffee installed new locks on the doors of the building. The trustee filed an order requiring Cuffee to show cause why he should not be held in contempt for violating the automatic stay. As a result, the bankruptcy court ordered Cuffee to cease any further interference with the operation of the radio station and to allow the trustee free access to the studio. Even in face of this order, Cuffee installed additional, larger locks. This further action caused the trustee to order the radio station to cease broadcasting to prevent any risk of injury. Moreover, "because Cuffee placed additional locks on the studio, the bankruptcy court found that Cuffee had violated the automatic stay provisions of Section 362 of the Bankruptcy Code." 901 F.2d at 327.[27] On

---

25. We reject the Secretary's contention that a finding that UMC's section 362(h) claim for costs arises from the same transaction or occurrence as the Department's violation of the automatic stay mandates a finding that the pre-petition overpayments and post-petition reimbursement arose out of the same transaction for the purposes of recoupment. Our conclusion that UMC's claim for costs resulting from the impermissible setoff arose out of the 1985 overpayments does not preclude our finding that the illegal setoff itself was an attempt to offset separate 1985 and 1988 transactions.

26. Because we conclude that the Department's immunity was waived by section 106(a), it is not necessary for us to address the arguments made

by UMC with regard to either 106(c) or the Equal Access to Justice Act, 28 U.S.C. § 2412(b) (1988). We note, however, that the Supreme Court's decision in *United States v. Nordic Village, Inc.*, conclusively establishes that Bankruptcy Code section 106(c) does not provide an unequivocal textual waiver of the Government's immunity from a bankruptcy trustee's claims for monetary relief. —— U.S. at ——, 112 S.Ct. at 1016.

27. We read the holding by the bankruptcy court, that Cuffee had violated the automatic stay, as being based upon Cuffee's placing of the additional locks on the studio, *after* the court had ordered him to cease any further interference with the operation of the radio station. It was

appeal, the district court affirmed the judgment of the bankruptcy court. We then affirmed the order of the district court in all respects. *Id.* at 329. In doing so, we for the first time defined the term "willful" as it is used in Section 362(h):

> A 'willful violation' does not require a specific intent to violate the automatic stay. Rather, the statute provides for damages upon a finding that the defendant knew of the automatic stay and that the defendant's actions which violated the stay were intentional. Whether the party believes in good faith that it had a right to the property is not relevant to whether the act was 'willful' or whether compensation must be awarded.

*Id.* (quoting *In re Bloom,* 875 F.2d 224, 227 (9th Cir.1989) [quoting *INSLAW, Inc. v. United States,* 83 B.R. 89, 165 (Bankr. D.D.C.1988) ] ). We then determined that Cuffee's actions clearly satisfied our definition of "willfulness" and that the finding of the bankruptcy court [that the placing of the additional locks on the studio violated the automatic stay] was not clearly erroneous.

Here, however, the actions of the Secretary were neither in defiance of a court order nor were they contrary to certain contemporaneous interpretations of sections 362 and 365. The Secretary believed in "good faith" that he was not violating the stay. This of course is not sufficient under *Atlantic Business* to escape liability under section 362(h). However, the Secretary also had persuasive legal authority which supported his position. For this reason we conclude that the withholding by HHS did not fall within the parameters of "willfulness" as such actions have been described in *Atlantic Business* and that the Secretary should not be penalized for the position he took toward UMC after the filing of the petition.

At the time the Department withheld payments from UMC, the law regarding the application of the stay to the Department's actions was sufficiently uncertain that HHS reasonably could have believed its actions to be in accord with the stay. Both the bankruptcy and district courts recognized that "authority existed in this and other jurisdictions that could be read to support the lawfulness of [such] withholding." *University Medical Center,* 125 B.R. at 127. The Secretary could find support for his position both in the Medicare statute and in case law. First, the Medicare Act provides that

> The Secretary shall periodically determine the amount which should be paid under this part to each provider of services with respect to the services furnished by it, and the provider of services shall be paid, at such time or times as the Secretary believes appropriate (but not less often than monthly) and prior to audit or settlement by the General Accounting Office, from the Federal Hospital Insurance Trust Fund, the amounts so determined, *with necessary adjustments on account of previously made overpayments or underpayments....*

42 U.S.C. § 1395G(a) (emphasis added). As the Secretary has argued persistently, this language appears to give him a clear mandate to withhold past overpayments from any payments he is making to a provider for services furnished—at whatever time those services were rendered.

In addition, there were a number of decisions from bankruptcy and district courts which held to the effect that a debtor hospital "could not continue as a provider following the filing of a petition for reorganization ... unless it effectively assumed the obligations of the provider agreement under which it had previously been operating." *Advanced Professional Home Health Care,* 94 B.R. 95, 96 (E.D.Mich. 1988).[28] Moreover, there had not been consideration of the question by any court of appeals. Thus, as with the statutory language, the case law supported the Secretary's position.

We have set out in Section III B and C above the reasons for which we hold, con-

this holding which was affirmed by the district court and this court in *Atlantic Business.* It is because of this limited scope of the legal determination in *Atlantic Business* that we do not agree with Judge Becker that the holding in *Atlantic Business* constrains us to find a "willful" violation of § 362(h).

28. Other cases supporting this position are cited in footnote 20.

trary to the above authority, that the Secretary did violate the automatic stay. However, these are very close and complex legal questions. We find that the Secretary was justified in standing firm in his position and in litigating these issues vigorously. We conclude, therefore, that the actions of the Secretary, taken in reliance on statutory direction and case law support, were not "willful" as we have defined that term in section 362(h) or in our explication of it in *Atlantic Business.*

We will affirm the district court's conclusion that the Department's violation of the automatic stay was not willful and will decline to award attorneys' fees and costs pursuant to section 362(h).

## V. CONCLUSION

For the foregoing reasons, the order of the district court will be affirmed.

BECKER, Circuit Judge, concurring in No. 91–1407 and dissenting in No. 91–1438.

I am pleased to join in Parts I, II, III, IV.A, IV.B, IV.C, IV.D, and IV.E.1 of Judge Roth's superb opinion. I wholeheartedly concur in the majority's sensitive harmonization of the competing interests of the Medicare and bankruptcy statutes. I also agree with the majority that in 11 U.S.C. § 106(a) Congress waived the sovereign immunity of the United States against awards of costs and fees under 11 U.S.C. § 362(h). If we were writing on a clean slate, moreover, I would further agree with the majority that, in light of the case law at the time, the United States did not "willfully" violate the automatic stay provision of 11 U.S.C. § 362(a) because it had good reason to believe that the automatic stay did not apply. In my view, however, the standard set forth in our opinion in *Atlantic Business and Community Corp.,* 901 F.2d 325, 329 (3d Cir.1990), compels the conclusion that the United States "willfully" violated the automatic stay.

As the majority recognizes, in *Atlantic Business* we interpreted "willful violation" to mean that the defendant knew of the automatic stay and that its actions in violation of the automatic stay were intentional—not to require that the defendant specifically intended to violate the automatic

stay. *Id.* (adopting the standard of *In re Bloom,* 875 F.2d 224, 227 (9th Cir.1989)). We explicitly rejected good faith as a defense to "willfulness." *Id.*

In this case, the United States knew that UMC had declared bankruptcy when it refused to reimburse UMC and hence knew of the automatic stay. The withholding of reimbursement was an intentional act. Under the interpretation of 11 U.S.C. § 362(h) in *Atlantic Business,* that is enough to entitle UMC to its actual damages, including costs and attorneys' fees. In my view, if the United States relied on the case law at the time, that would demonstrate its good faith, but we have held that good faith is insufficient to defeat a finding of "willfulness." I agree that *Atlantic Business* may be distinguished on its facts, but I do not believe that we can avoid applying its legal standard.

I would therefore remand the case for the bankruptcy court to determine UMC's actual damages, including costs and attorneys' fees. I accordingly respectfully dissent from the disposition of UMC's cross-appeal.